Willie Jasper DARDEN, Petitioner-Appellant, Cross-Respondent,

v.

Louie L. WAINWRIGHT, Secretary, Department of Corrections, State of Florida, Respondent-Appellee, Cross-Petitioner.

No. 81–5590.

United States Court of Appeals, Eleventh Circuit.

Feb. 22, 1984.

Certiorari Denied June 4, 1984. See 104 S.Ct. 2688.

Robert Augustus Harper, Jr., Tallahassee, Fla., for petitioner-appellant, cross-respondent.

Geoffrey M. Kalmus, New York City, amicus curiae, for NAACP Legal Defense and Educational Fund, Inc.

Richard W. Prospect, Asst. Atty. Gen., Daytona Beach, Fla., for respondent-appellee, cross-petitioner.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, ANDERSON and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.*

* Circuit Judge Joseph W. Hatchett, having recused himself, did not participate in this decision. Senior Circuit Judge Lewis R. Morgan elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

JOHNSON, Circuit Judge:

Willie Jasper Darden appeals the denial by the district court of his habeas corpus petition, challenging the constitutionality of his conviction and death sentence. As grounds for relief, petitioner claims that he was denied effective assistance of counsel, that the prosecutors' closing arguments to the jury denied him a fair trial, and that venirepersons were improperly excluded from the jury in violation of the rule of *Witherspoon v. Illinois.* This Court sitting en banc has twice considered issues raised by this appeal and has concluded on the basis of the Supreme Court's uniform and consistent application of the rule in *Witherspoon* that the district court's denial of habeas relief must be reversed.

Darden was charged with first degree murder, robbery and assault with intent to commit murder in the first degree based upon events occurring at Carl's Furniture Store in Lakeland, Florida, on September 8, 1973.[1] The jury found Darden guilty on all three counts and recommended the penalty of death. The trial court concurred in the jury's recommendation and imposed the death sentence.

Darden's conviction and sentence were affirmed by the Florida Supreme Court in *Darden v. State,* 329 So.2d 287 (1976). The United States Supreme Court initially granted Darden's petition for writ of certiorari, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282, but later dismissed the writ as improvidently granted, 430 U.S. 704, 97 S.Ct. 1671, 51 L.Ed.2d 751.

After the Governor of Florida signed a warrant for Darden's execution, Darden filed a petition for habeas relief in the United States District Court for the Middle District of Florida, raising the issues presented in this appeal. The court entered a stay of execution and assigned the case to a magistrate who, after a hearing on the ineffective assistance of counsel claim, rec-

1. The historical facts are set out in greater detail in *Darden v. Wainwright,* 513 F.Supp. 947 (M.D.Fla.1981), and *Darden v. State,* 329 So.2d 287 (Fla.1976).

ommended that the district court grant the habeas petition on the basis of Darden's claims of prosecutorial misconduct during closing argument and improper juror excusal. The district court rejected the magistrate's recommendation and denied habeas relief. Darden timely noticed this appeal.

## I. THE *WITHERSPOON* ISSUE

*The Legal Standard.* During the jury qualification and selection procedure, the trial court excused for cause several venirepersons who expressed opposition to the death penalty. Petitioner argues that two of these dismissals were errors of constitutional magnitude under the standard established by the Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Witherspoon,* the Supreme Court held that a death sentence "cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777 (footnote omitted). *Witherspoon* recognized that a jury purged of all those who express religious or conscientious scruples against capital punishment is not the impartial jury promised by the Sixth and Fourteenth Amendments; it is instead "a jury uncommonly willing to condemn a man to die." *Id.* at 521, 88 S.Ct. at 1776. The Court at the same time recognized the necessity of excusing jurors whose intractable opposition to capital punishment would distort their judgment on the facts developed in the case before them and would frustrate the state's legitimate efforts to implement an otherwise constitutional death penalty scheme. The Court thus fashioned the rule that prospective jurors cannot be excused from jury service on the basis of their opposition to the death penalty unless they make it

unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original).

This Circuit strictly adheres to the mandate of *Witherspoon, Granviel v. Estelle,* 655 F.2d 673, 677 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982),[2] which we understand to require that

[o]nly the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds.

*Burns v. Estelle,* 592 F.2d 1297, 1300 (5th Cir.1979), *adhered to en banc,* 626 F.2d 396 (1980).

*Witherspoon* sets a strict legal standard and imposes as well a very high standard of proof. The venireperson must make it "unmistakably clear" that he or she will automatically vote against the death penalty. 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. "Unless a venireman states unambiguously that he would automatically vote against imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." *Id.* at 515–16 n. 9, 88 S.Ct. at 1773–74 n. 9. Thus, any ambiguity must be resolved by not excluding the venireperson from the jury.

*The Standard of Appellate Review.* Application of the *Witherspoon* rule and its standard of proof has generated a plethora of cases in which appellate courts have closely reviewed trial courts' voir dire examinations of prospective jurors to deter-

2. The Eleventh Circuit Court of Appeals has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent, which is binding unless and until overruled or modified by this Court en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

mine whether those excluded made unmistakably clear their rigid resolve to oppose the death penalty. In these many cases, no court has explicitly determined the standard that should govern appellate review of trial courts' *Witherspoon* decisions. Courts instead have proceeded without discussion to review independently the transcript of the voir dire questioning and to determine whether the constitutional standards articulated in *Witherspoon* were met. The question of the appropriate standard of review recently has come to the fore with some suggestion that *Witherspoon* review should accord considerable deference to the decision reached by the trial judge. *See O'Bryan v. Estelle,* 714 F.2d 365, 391–96 (5th Cir.1983) (Higginbotham, J., concurring); *id.* at 400–12 (Buchmeyer, J., dissenting); *Alderman v. Austin,* 695 F.2d 124, 128–34 (5th Cir. Unit B 1983) (en banc) (Fay & Roney, JJ., dissenting). The time thus seems appropriate to decide directly the standard that appellate courts should apply in reviewing *Witherspoon* exclusions.

Although no court previously has explicitly decided the proper standard of review in *Witherspoon* cases, the manner in which appellate courts, including the Supreme Court, have conducted the many reviews that they have made of *Witherspoon* decisions provides guidance for this Court's decision. The predominant if not exclusive method of review undertaken by the federal courts, whether on direct review or in habeas proceedings, has been an independent review, based upon a close study of the voir dire transcript to determine whether a venireperson was improperly excluded from the jury. *See, e.g., Adams v. Texas,* 448 U.S. 38, 49–51, 100 S.Ct. 2521, 2528–29, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio,* 438 U.S. 586, 595–97, 98 S.Ct. 2954, 2959–61, 57 L.Ed.2d 973 (1978); *Maxwell v. Bishop,* 398 U.S. 262, 264–65, 90 S.Ct. 1578, 1580–81, 26 L.Ed.2d 221 (1970); *Boulden v. Holman,* 394 U.S. 478, 482–84, 89 S.Ct. 1138, 1140–42, 22 L.Ed.2d 433 (1969); *Spencer v. Zant,* 715 F.2d 1562, 1576–77, *reh'g granted en banc,* 729 F.2d 1293 (11th Cir.1983); *King v. Strickland,* 714 F.2d 1481, 1492–93 (11th Cir.1983); *Witt v. Wainwright,* 714 F.2d 1069, 1080–83 (11th Cir.1983); *Hance v. Zant,* 696 F.2d 940, 954–56 (11th Cir.1983); *Bell v. Watkins,* 692 F.2d 999, 1006–08 (5th Cir.1982); *Williams v. Maggio,* 679 F.2d 381, 383–86 (5th Cir.1982) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983); *Alderman v. Austin,* 663 F.2d 558, 562–64 (5th Cir. Unit B 1982), *aff'd in relevant part,* 695 F.2d 124 (1983) (en banc); *Granviel v. Estelle,* 655 F.2d 673, 677–78 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *Burns v. Estelle,* 592 F.2d 1297, 1300–01 (5th Cir. 1979), *adhered to en banc,* 626 F.2d 396, 397–98 (1980).

The approach taken by the courts is consistent with the demands of the law. Application of the *Witherspoon* rule involves a mixed question of law and fact, which makes it a determination subject to independent review by an appellate court. *See Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *Brown v. Allen,* 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (Frankfurter, J.); *Hance v. Zant,* 696 F.2d 940, 946–47 (11th Cir.1983); *Young v. Zant,* 677 F.2d 792, 798 (11th Cir.1982); *see also Pullman-Standard v. Swint,* 456 U.S. 273, 289–90 n. 19, 102 S.Ct. 1781, 1790–91 n. 19, 72 L.Ed.2d 66 (1982) (citing Supreme Court authority for independent appellate court review of mixed questions of law and fact).

Mixed questions of law and fact involve " 'the application of legal principles to the historical facts of [the] case.' " *Hance, supra,* 696 F.2d at 947 (quoting *Cuyler, supra,* 446 U.S. at 342, 100 S.Ct. at 1715). " 'Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts ... the [Federal] Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' " *Id.* (quoting *Brown v. Al-*

*len,* 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (Frankfurter, J.)).

■ The trial judge during voir dire questioning must apply the *Witherspoon* legal standard to the venireperson's responses. He or she must interpret the legal significance of the answers given. The answers alone do not dispose of the issue; the judge must decide whether the responses make unmistakably clear the prospective juror's unbending opposition to capital punishment. Because the trial court undertakes this application of law to fact, the court on appeal must independently review the colloquy preserved in the voir dire transcript to determine whether the trial court correctly applied the constitutional standard to the statements made.[3]

■ While the appellate court clearly bears the responsibility to review independently the mixed question of fact and law involved in a *Witherspoon* determination and ultimately to decide whether *Witherspoon*'s requirements were met, that responsibility does not preclude the court on appeal from according deference to the decision of the trial judge who had an opportunity to hear the venirepersons' responses and observe their demeanor. *See McCorquodale v. Balkcom,* 721 F.2d 1493, 1498 (11th Cir.1983) (en banc); *see also O'Bryan v. Estelle,* 714 F.2d 365, 393–96 (5th Cir. 1983) (Higginbotham, J., concurring) (independent appellate review to determine whether trial court abused its discretion). Review of the *Witherspoon* questions posed to the veniremembers, because it involves only a determination whether the trial court employed the proper legal standard, remains always a matter exclusively for the court on appeal. Appellate review of the venirepersons' responses to those questions, however, because it involves a determination of the intended meaning of the responses given, as well as application of the appropriate legal standard, may benefit by

consideration of the trial judge's interpretation. The court on appeal, thus, should grant deference to the trial judge's assessment of the venirepersons' responses, including the venirepersons' demeanor and the clarity of the venirepersons' responses, to questions posed. However, the prescribed independent appellate review of mixed questions of fact and law and *Witherspoon*'s strict rule that venirepersons make unmistakably clear their automatic opposition to capital punishment ultimately require an appellate court to reach its own judgment on the question whether a venireperson was improperly excluded from a jury. *See McCorquodale, supra,* 721 F.2d at 1498.

*Application of the Standard.* Darden challenges the excusal for cause of venirepersons Varney and Murphy. He maintains that their responses to voir dire questions failed to make unmistakably clear their unbending opposition to capital punishment.

■ Improper exclusion of even one venireperson is a sufficient basis for granting the habeas petition in this case. *See Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976); *Witt v. Wainwright,* 714 F.2d 1069, 1081 & n. 8 (11th Cir.1983). Careful review of the voir dire transcript in this case reveals that venireperson Murphy was excused in violation of the *Witherspoon* principles. We therefore find it unnecessary to consider whether venireperson Varney also was improperly excused.

Only one question purporting to relate to the *Witherspoon* principles was asked of venireperson Murphy.

> THE COURT: Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable *without violating your own*

---

**3.** The trial judge's *Witherspoon* exclusion decisions thus are not subject to 28 U.S.C.A. § 2254(d), which provides in federal habeas cases a presumption of correctness to the written findings of fact made by the state trial judge after a hearing on the merits of a factual

issue. Mixed questions of law and fact are not subject to this statutory presumption. *Hance v. Zant,* 696 F.2d 940, 946 (11th Cir.1983) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980)).

*principles* to vote to recommend a death penalty regardless of the facts?

MR. MURPHY: Yes, I have.

THE COURT: All right, sir, you will be excused then.

Record at 165 (emphasis added).

The court in this instance applied the wrong legal standard.[4] The question in a *Witherspoon* inquiry is not whether prospective jurors could vote for the death penalty without violating their principles, but whether, if they have principles against capital punishment, they could put them aside and vote for the death penalty when the law and the facts of the case require it. *Witherspoon* and its progeny explicitly recognize that some jurors, notwithstanding their opposition to capital punishment, would be willing to return a verdict of death, making their scruples subservient to their duty as jurors. *Adams v. Texas,* 448 U.S. 38, 44–45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Boulden v. Holman,* 394 U.S. 478, 483–84, 89 S.Ct. 1138, 1141–42, 22 L.Ed.2d 433 (1969); *Witherspoon v. Illinois,* 391 U.S. 510, 515–16 n. 9, 88 S.Ct. 1770, 1773–74 n. 9, 20 L.Ed.2d 776 (1968).

The government argues that the question asked of Mr. Murphy and Mr. Murphy's response must be read in light of the trial court's earlier correct statement of the *Witherspoon* issue. If the question directed to the venireman was imperfect, the government maintains that the prior correct statement of the issue cures any *Witherspoon* error.

■ In determining whether a prospective juror was properly excluded, the court considers the entire voir dire to place in proper context the venireperson's responses. *Witt v. Wainwright,* 714 F.2d 1069, 1083

(11th Cir.1983); *King v. Strickland,* 714 F.2d 1481, 1492–93 (11th Cir.1983). Just as the Court "does not require that the venireperson utter a pat phrase, the incantation of which magically frees the power of excusal from its yoke of unconstitutionality," *Witt, supra,* 714 F.2d at 1083, so the Court will review the "totality of the circumstances of the voir dire," *id.,* to determine whether the trial court correctly posed the *Witherspoon* questions to the venireperson who was excused.

In the trial of this case, the judge at the start of the voir dire called twelve venirepersons into the jury box.[5] Addressing the people seated in the jury box, the judge then stated:

THE COURT: Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death sentence even though the facts presented to you should be such as under the law would require that recommendation? Do you understand my question?

Record at 43.

At the time that this statement was made, Mr. Murphy was not among those seated in the jury box. The statement thus was not even addressed to him. Later in the voir dire—one hundred and twenty-two pages later in the voir dire transcript—Murphy was seated in the jury box, and the improper question was posed to him. In view of this Court's strict adherence to the requirements of *Witherspoon, Granviel v. Estelle,*

---

4. The trial court's misunderstanding of the *Witherspoon* issue is evident at another point in the record. At a conference in chambers with the attorneys and defendant present, the judge said:

It is my ruling if a prospective juror states on his voir dire examination that because of his moral, religious or conscientious principles and belief [sic] he would be unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law, then he in effect has said that he would be unwilling to follow the law the court shall charge upon it and disregard and be unwilling to follow it *or if he did follow it, it would be going against his principles,* and, therefore, *I would rule that would be disqualification. If that exists, I intend to disqualify for cause.*

Record at 18.

5. Record at 30–32.

655 F.2d 673, 677 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982), and the strict requirements of *Witherspoon* itself, we cannot assume that Mr. Murphy heard the correct articulation of the *Witherspoon* standard or that, if he heard it, he remembered it and knew it to be the correct statement of the question when he was later questioned incorrectly.[6]

*Witherspoon* makes clear that death sentences cannot stand in cases in which venirepersons were excluded on any broader basis than that established by the *Witherspoon* opinion. 391 U.S. at 521–22 n. 21, 88 S.Ct. at 1776–77 n. 21. This firm rule requires that we grant the habeas petition in this case.

The decision to recommend a sentence of death places upon a jury a most awesome responsibility. The trial judge bears the ultimate responsibility to provide each defendant a fair trial and an impartial jury, and the selection of the men and women who serve on the jury in a capital case requires great diligence. Inquiry, on voir dire, as to the prospective jurors' views on the death penalty is a critical inquiry. Improper *Witherspoon* questioning can lead to the unconstitutional exclusion of jurors whose reservations about the death penalty do not disqualify them from service. Should any be so excluded, the death penalty cannot, constitutionally, be imposed, no matter what the evidence may show, for their exclusion denies the defendant an impartial jury and produces instead a jury that is "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois,* 391 U.S. 510, 521, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776 (1968).

The *Witherspoon* rule, though articulated over 15 years ago and applied many times by many courts over the course of its life, all too frequently forms the basis for a reversal of a death sentence. State trial courts and federal district courts must exercise greater care to ensure that the Supreme Court's requirements are met. Only a procedure that employs precise questions—questions that clearly pose the twofold *Witherspoon* inquiry set out in footnote 21 of the Supreme Court's opinion—and that elicits unmistakably clear answers from each venireperson can satisfy the Court's strict standard.

## II. THE PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL ISSUES

Petitioner also appeals the district court's denial of his request for habeas corpus relief based on his claim of prosecutorial misconduct in the state's closing argument to the jury and his assertion of ineffective assistance of counsel. The en banc court concludes that the panel's evaluation of these issues was correct and reinstates the relevant portion of the panel's opinion, 699 F.2d at 1033–37.

## III. CONCLUSION

The district court's denial of the writ of habeas corpus on the basis of its determination under *Witherspoon* is reversed. The State shall be prohibited from carrying out the sentence in this case unless the petitioner is afforded a new sentencing hearing within a reasonable time to be fixed by the district court. The district court's denial of

**6.** Nor can the government find a cure in the *Witherspoon* question posed to Mr. Staha, the venireperson who was questioned immediately before Mr. Murphy. Mr. Staha was asked:

> THE COURT: Do you have any opinion or principles in opposition to the death penalty that are so strong that it would make it impossible *or very difficult* for you to vote to recommend a verdict of a death sentence regardless of what the facts might be?

Record at 160 (emphasis added). This is an incorrect articulation of the *Witherspoon* question because it assumes that a venireperson should be excused if it is only "very difficult" for him or her to vote to recommend death. *See Adams v. Texas,* 448 U.S. 38,.50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980) ("[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever [of the death penalty on one's deliberations as a juror] is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty.").

habeas relief on the basis of its review of petitioner's claims of prosecutorial misconduct and ineffective assistance of counsel is affirmed. The case is remanded for proceedings not inconsistent with this opinion.

REVERSED in part; AFFIRMED in part; REMANDED.

TJOFLAT, Circuit Judge, dissenting:

The court today violates the Supreme Court's "total exhaustion" rule of *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), by entertaining the merits of a habeas corpus petition that presents both exhausted and unexhausted claims. I therefore dissent.

### I.

28 U.S.C. 2254(b) and (c) (1976) states:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court *shall not be granted* unless it appears that the applicant *has exhausted* the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

(c) An applicant *shall not be deemed* to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by

any available procedure, the question presented. (emphasis added).

In *Galtieri v. Wainwright* this court held, en banc, that "a federal district court must dismiss without prejudice a 'mixed' petition for a writ of habeas corpus [i.e., one containing both exhausted and unexhausted claims] filed by a state prisoner"[1] and that state habeas corpus "petitioners must present *all* their claims to the state court system before turning to the federal courts."[2] The Supreme Court subsequently held in *Rose v. Lundy* that federal district courts must dismiss mixed petitions summarily,[3] and that federal courts of appeals may not review any claims that have been presented in a mixed petition to the district court.

The district court in this case was bound by the statute and our holding in *Galtieri.*[4] Nevertheless, the district court entertained, on the merits, a twenty-six count petition containing a plethora of unexhausted claims.[5] *See infra* at 1534–1536. The panel that initially considered this appeal was precluded by *Rose* and the statute from considering the merits of any of petitioner's claims. Like the district court, the panel ignored its clear duty to dismiss the petition for want of exhaustion. Today the court, sitting en banc, repeats this error.

### II.

The record shows that, after his trial, petitioner unsuccessfully brought eight

---

1. 582 F.2d 348, 355 (5th Cir.1978), citing *West v. Louisiana,* 478 F.2d 1026, 1034 (5th Cir. 1973), *aff'd regarding exhaustion en banc,* 510 F.2d 363 (5th Cir.1975). In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

2. 582 F.2d at 351.

3. Justice O'Connor, speaking for the Court, explained the "rigorously enforced total exhaustion rule," 455 U.S. at 518, 102 S.Ct. at 1203, in parts III A and B of her opinion. She was joined in those sections by Chief Justice Burger and Justices Rehnquist and Powell. Justice Brennan, joined by Justice Marshall, concurred in the rule, *id.* at 532, 102 S.Ct. at 1210 ("I agree with the Court's holding that the exhaustion requirement of 28 U.S.C. § 2254(b), (c)

obliges a federal district court to dismiss, without consideration on the merits, a habeas corpus petition from a state prisoner when that petition contains claims that have not been exhausted in the state courts."). Justice White agreed with Justice Blackmun's concurrence in the judgment, which opined that a district court need not dismiss every mixed petition, but could consider exhausted claims. Justice Stevens dissented.

4. The district court's order preceded *Rose v. Lundy* by 10 months.

5. Judge Fay, *infra* at 1551, states that the petitioner has exhausted all his state remedies. I suggest that the record is to the contrary. *See infra* notes 9–13 and accompanying text.

claims of error on direct appeal to the Florida Supreme Court,[6] and three claims on collateral attack.[7] The Florida Supreme Court's opinions disposing of these appeals do not indicate whether petitioner presented these claims of error under the federal Constitution or state law.[8] In any event, the Florida Supreme Court rejected these claims.

On May 21, 1979, petitioner commenced these habeas corpus proceedings in the district court. His petition contained two federal constitutional claims: (1) prosecutorial misconduct and (2) improper pretrial identification. The State answered his petition on May 22, and conceded that these two claims had been exhausted. On July 5 the State moved the court for leave to propound interrogatories to petitioner, indicating that in order to avoid abuse of the writ problems "now is the proper time to fully litigate and resolve all justiciable issues . . . petitioner would be well advised to present all claims at this time. . . ."[9] Petitioner answered the interrogatories and amended his petition to add an ineffective assistance of counsel claim under the sixth and fourteenth amendments. On September 7 petitioner supplemented his answer to the State's interrogatories, listing twenty-three additional federal constitutional claims, for a total of twenty-six.[10] The parties then

**6.** According to the Florida Supreme Court, petitioner alleged the following grounds for reversal: (1) the racial composition of the jury venire was improper; (2) improper exclusion of prospective jurors because of their expressed attitudes toward the death penalty; (3) the alleged unconstitutionality of the sentencing provisions of the applicable Florida statutes; (4) the State's eliciting from a State witness a comment regarding other murder cases in which petitioner was a suspect; (5) and (6) in-court identifications by two victims were tainted by improper pretrial show-ups; (7) erroneous admission into evidence of a gun allegedly used by petitioner in committing the holdup and murder; and (8) prosecutorial misconduct concerning closing argument. *Darden v. State,* 329 So.2d 287, 288 (Fla.1976).

**7.** Petitioner collaterally attacked his conviction under Fla.R.Crim.P. 3.850 (1984), alleging ineffective assistance of counsel and newly discovered evidence. *Darden v. State,* 372 So.2d 437 (Fla.1979). Additionally, he attacked the executive department's clemency procedures in a separate suit. *Darden v. Graham,* 372 So.2d 436 (Fla.1979). The Florida Supreme Court rejected all three claims on the merits.

**8.** The record does not contain the briefs the petitioner and the State filed with the Florida Supreme Court in these appeals; thus we have no definitive means of determining whether petitioner's claims of error were grounded on federal or state law. This problem would not have arisen had the Florida Attorney General complied with his duty under the federal habeas corpus rules by attaching copies of petitioner's briefs to the Florida Supreme Court to his answer to petitioner's habeas petition. *See* rule 5, Rules Governing § 2254 cases, 28 U.S.C. foll. § 2254 (1976): "If the petitioner appealed from the judgment of conviction or from an adverse judgment or order in a post-conviction proceeding, a copy of the petitioner's brief on appeal and of the opinion of the appellate court, if any, shall also be filed by the respondent with the answer."

**9.** This is a tactic the State should have pursued in the state collateral attack court, since under the exhaustion doctrine the state courts have the initial responsibility to address and dispose of a petitioner's federal constitutional attack on his conviction. *See infra* text at 1536–1539.

**10.** The first three claims, stated in the original petition or by the initial amendment, were (1) prosecutorial misconduct, primarily in closing argument; (2) improper pretrial identifications; and (3) ineffective assistance of counsel. The remaining claims, stated in the interrogatories, were (4) that petitioner's execution would constitute excessive punishment in violation of due process and the eighth amendment because the justifications asserted to support the death penalty were insufficient to take his life; (5) the death sentence violated the eighth amendment because it would inflict unnecessary pain and torment; (6) prosecutorial misconduct in the penalty phase; (7) petitioner's counsel rendered ineffective assistance of counsel at the penalty stage of his trial; (8) petitioner's execution would violate due process and equal protection because the Office of Executive Clemency operated in an unfair, irregular, and arbitrary manner; (9) the jury was selected using procedures that systematically excluded persons having conscientious or religious scruples against the death penalty; (10) petitioner's sixth amendment rights were violated because persons with scruples against the death penalty were excluded from the jury so that it did not represent a cross-section of the community; (11) because of petitioner's poverty he was denied the opportunity to prepare and present evidence against the death penalty; (12) petitioner was not given adequate notice or oppor-

stipulated on September 14 that the twenty-three additional claims should be included in petitioner's habeas petition. On the same day the magistrate to whom the district court had referred the case entered an order noting that "[t]he Petitioner has added additional claims for habeas corpus relief without objections of the [State], and [the State] has waived any claim that Petitioner has failed to exhaust state court remedies as to any claims presented." The State then answered these claims on the merits. The magistrate, and subsequently the district court, addressed each of petitioner's claims on the merits.

Assuming that the eleven claims petitioner presented to the Florida Supreme Court on direct appeal and on collateral attack were claims of federal constitutional error,[11] petitioner raised three types of claims in the district court: claims presented on the merits to the state courts and exhausted;[12] claims not presented to the state courts but—because of some sort of procedural abandonment—no adequate state remedy remained;[13] and claims not presented to the state courts for which state court adjudication on the merits remained available.[14] The district court could properly entertain the first and second categories of petitioner's claims if they were all the petition contained. 28 U.S.C. § 2254(b) (1976). The petition, however, contained claims from the third category. These claims, at least nine in number, were unexhausted and would have presented a justiciable controversy in the state courts. The petition was thus a "mixed" one. Anything but a summary dismissal of a mixed petition disregards *Rose v. Lundy,* the statute, and the

tunity to present evidence and argument addressed to the sentence; (13) petitioner was denied timely notice of, and fair opportunity to meet, prejudicial evidence presented at his penalty trial; (14) the sentence was based upon facts not established beyond a reasonable doubt; (15) because of petitioner's poverty he was denied a chance to present a defense to the capital charge; (16) the grand and petit juries were selected through procedures which systematically excluded racial minorities from jury service; (17) considering the circumstances of the offense and offender, the death penalty was grossly disproportionate and excessive; (18) petitioner's death sentence was the result of the selective prosecution in Polk County and the Tenth Judicial Circuit of capital defendants who refused to plead guilty; (19) petitioner's sentence was imposed pursuant to a system of arbitrary and capricious capital sentencing; (20) his sentence was imposed pursuant to racial discrimination in capital sentencing; (21) his sentence was imposed pursuant to wealth discrimination in capital sentencing; (22) his sentence was imposed pursuant to gender discrimination in capital sentencing; (23) given the circumstances surrounding petitioner and his offense, the sentence imposed was disproportionate and excessive when compared to similar cases; (24) the Florida Supreme Court denied petitioner notice and opportunity to be heard concerning its proportionality review of his sentence and because of his indigency denied him facts regarding similar cases; (25) because of his indigency the state denied petitioner opportunity for commutative relief; and (26) petitioner was legally incompetent [time unspecified] and the state denied him funds to prove same.

11. *See supra* note 8 and accompanying text.

12. *See supra* note 10 claims 1–3, 6–8.

13. This type of claim is usually one that is not adequately preserved at trial, or is abandoned by failure to bring it on appeal. In either case, the state courts generally will not hear the claim further. *See, e.g., Hargrave v. State,* 396 So.2d 1127 (Fla.1981); Fla.R.Crim.P. 3.850 (1984). A Florida court will not recognize such a procedurally defaulted claim and grant relief thereon; therefore, a federal district court may hear such a claim on habeas without the petitioner first presenting the claim to state court. *See* § 2254(b) ("absence of available State corrective processes ..."). *Accord, Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982). *See also Galtieri,* 502 F.2d at 354. Of course, no habeas petitioner may bring a procedurally defaulted claim into federal court without showing cause and prejudice under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and its progeny. *See, e.g., Isaac, supra,* 456 U.S. at 129, 102 S.Ct. at 1572 ("when a procedural default bars state litigation of a constitutional claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice").

The habeas petition in this case alleged a number of claims not presented to a state court but permissible under § 2254(b)—with a showing of cause and prejudice—because no adequate state remedy existed at the time of filing. *See supra* note 10 (claims 4–5, 9–16, and possibly claim 18).

14. *See supra* note 10 (claims 17, 19–26, and possibly claim 18).

compelling policy arguments behind the statute. This Court has placed itself in the same posture as the Sixth Circuit, which was reversed in *Rose v. Lundy.*

### III.

The plain words of sections 2254(b) and (c) and *Rose v. Lundy* forbid the entertainment of petitioner's appeal on the merits. *See* discussion *infra* text at 1543–1544. Moreover, the express language of the statute and *Rose* leave no room for a state attorney general's waiver of exhaustion. *But see Thompson v. Wainwright,* 714 F.2d 1495, 1497 (11th Cir.1983). *See* discussion *infra* text at 1539–1543. It is true that the drafters of the statute and the authors of *Rose,* and *Galtieri,* did not expressly consider whether a state attorney general could waive the exhaustion requirement found in sections 2254(b) and (c); the policy reasons behind the exhaustion rule preclude such a waiver, however, and require us to dismiss the petition.

Exhaustion in state prisoner habeas proceedings was developed a century ago as a consideration of comity, an equitable notion that federal courts hearing state prisoner claims should exercise discretion

> in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the states, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the constitution.

*Ex parte Royall,* 117 U.S. 241, 251, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886). The courts later refined this concept into the rule that state remedies must be exhausted except in certain limited circumstances. *See Rose,* 455 U.S. at 515, 102 S.Ct. at 1202 (citing cases). In 1948, Congress codified this rule in 28 U.S.C. § 2254. The exhaustion rule found in sections 2254(b) and (c), based on

notions of comity, places limitations on the federal courts' exercise of habeas corpus jurisdiction. It states:

> (b) *An application for a writ ... shall not be granted* unless it appears that the applicant has exhausted ....
>
> (c) An applicant *shall not be deemed* to have exhausted ... if he has the right under the law of the State to raise, *by any available procedure,* the question presented. (emphasis added).

These limitations are cast in mandatory, obligatory language. Following a total exhaustion rule does more than further notions of comity, it complies with the dictates of Congress.

Congress codified the exhaustion rule because of the advantages it presents in managing our dual court systems. Exhaustion of state remedies furthers federalism by maintaining the delineation between federal and state court systems and ensuring federal respect for state courts. Comity has been defined as giving proper deference to states,[15] but comity in a federal system cuts both ways; the states may not impose on the federal courts the primary task of reviewing its criminal convictions. The exhaustion rule furthers the efficient working of both federal and state courts.

### A. The Exhaustion Rule and State Courts

The strict exhaustion rule defined by *Rose v. Lundy* furthers a number of interests of the state court systems. First, it pays great respect to state courts, recognizing the integrity of the state court system and its need to assure a complete disposal of each case presentable to it. State judges, just like federal judges, are sworn to uphold the Constitution. The exhaustion rule recognizes this fact by permitting the state system to be the first to adjudicate on the merits each claim a petitioner may later seek to bring into federal court.

---

15. *Thompson* discussed comity as it served "the interests of the state and its sovereignty...." 714 F.2d at 1506. *Rose,* however, described the role of exhaustion in "protect[ing] the state *courts'* role in the enforce-ment of federal law and ... state *judicial proceedings.*" 455 U.S. at 518, 102 S.Ct. at 1203 (emphasis added). *See, e.g., Thompson,* 714 F.2d at 1507 n. 11; *Rose,* 455 U.S. at 518, 102 S.Ct. at 1203 (1982).

Second, exhaustion ensures that state courts may entertain and decide constitutional claims without interference by federal district courts.[16] *See Duckworth v. Serrano,* 454 U.S. 1, 2, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam) (exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights"). As the Supreme Court stated in *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982), "[t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good faith efforts to honor constitutional rights." *Cf. Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (federal court must normally abstain from deciding issues implicated in ongoing criminal proceedings in state court).

Third, exhaustion enables state courts to address the prisoner's claims in light of state evidentiary, procedural, and substantive law. This permits the courts to ensure a uniform and accurate application of state law, which in many instances may remove the federal constitutional claims altogether. Even where state law is not dispositive of the case, it is still preferable for the state courts to act first. This enables them to become increasingly familiar with and hospitable toward federal constitutional issues.[17] The need for state court familiarity with federal constitutional principles has grown especially acute given the marked development of criminal procedural rules in recent times.[18]

Finally, the total exhaustion required by *Rose v. Lundy* enhances the possibility that the state court will satisfactorily resolve the petitioner's constitutional claims and bring his criminal case to a close. Such finality not only preserves the dignity of state courts, but aids deterrence, and assists rehabilitation. *See* Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 146 (1970); Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441, 444–62 (1963). It also reduces some of the "significant costs" of the Great Writ.[19]

### B. *The Exhaustion Rule and Federal Courts*

Federalism is a two-way street. The concepts of comity and federalism behind the exhaustion rule benefit federal courts as well as state courts.[20] The rule requires a petitioner first to flush out all of his claims in state court, either on direct appeal or collateral attack. Collateral attacks usually occur relatively close in time to the trial;[21]

---

**16.** Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."
*Rose,* 455 U.S. at 518, 102 S.Ct. at 1203, citing *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950).

**17.** *Rose,* 455 U.S. at 519, 102 S.Ct. at 1203–04; *Galtieri,* 582 F.2d at 354 (without exhaustion "state court system would be isolated from federal constitutional issues and would not

have an impetus to develop and apply federal constitutional law").

**18.** *Accord, Isaac,* 456 U.S. at 128 n. 33, 102 S.Ct. at 1571 n. 33.

**19.** "We have always recognized ... that the Great Writ entails significant costs." *Isaac,* 456 U.S. at 126, 102 S.Ct. at 1571.

**20.** *Thompson* failed to acknowledge this point; it only analyzed the exhaustion principle in depth from the standpoint of state courts. *See* 714 F.2d at 1505–07.

**21.** In capital cases, however, the collateral attack is usually delayed until a death warrant issues, scheduling the prisoner's execution. In this case, petitioner was convicted in 1974, but

memories are sharper, and witnesses and evidence are more likely to be available. Thus by the time a petitioner's constitutional claims reach federal court, the historical facts that underpin his claims should have been ascertained. *Accord, Rose,* 455 U.S. at 519, 102 S.Ct. at 1203–04. The state court's findings of fact are so important to the federal courts that they will be presumed correct, and may well avoid the need for an evidentiary hearing in the district court. 28 U.S.C. § 2254(d) (1976). This is precisely the opposite of what happened in the case before us. The state courts had no chance to develop the facts that gave rise to many of petitioner's claims because these claims did not materialize until petitioner arrived in federal court.

The federal courts also benefit from state court treatment of federal constitutional claims in their established factual setting. Such treatment obviously reduces the potential for erroneous decision making at the federal level, and thus improves the quality of justice.[22]

The total exhaustion of a petitioner's claims should lessen the number of his claims that reach the district court. State courts will ferret out and identify the patently meritless claims. Some federal constitutional claims will be decided on the merits for petitioner and thereby precluded from habeas corpus review. Still others will be decided for the petitioner upon adequate state law grounds. In this last instance, the result of strict exhaustion is akin to *Pullman* abstention,[23] which enables a federal court to avoid the constitutional adjudication of the validity of state law if the law can be read by the state courts to eliminate the constitutional question from the case.

The total exhaustion rule of *Rose* aids the district courts because it is far easier and more efficient to administer than a rule, such as the one promulgated by *Thompson v. Wainwright,* 714 F.2d 1495 (11th Cir. 1983), and *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983), which authorizes a district court to entertain a mixed petition whenever the State waives the exhaustion requirement and the court is inclined to hear the merits of the petitioner's claims. *See infra* text at 1540–1543. First, the total exhaustion rule is easy for habeas petitioners to follow. As the Court stated in *Rose:* "§ 2254(b), (c) [provides] a simple and clear instruction to potential litigants: before you bring *any* claims to federal court, be sure that you first have taken *each* one to state court." 455 U.S. at 520, 102 S.Ct. at 1204 (emphasis added). The rule also provides a clear instruction to magistrates and district court judges: mixed habeas petitions must be dismissed summarily. *See id.* at 520, 102 S.Ct. at 1204 (requiring "strict enforcement of the exhaustion requirement"); *id.* at 527, 102 S.Ct. at 1207 (Blackmun, J., concurring in judgment) (interpreting majority to hold that district court must dismiss entire petition); *see also Galtieri,* 582 F.2d at 355–56. As Justice Brennan stated in his partial concurrence in *Rose,* "the exhaustion requirement of 28 U.S.C. §§ 2254(b), (c) obliges a federal district

---

the Governor did not issue the death warrant until 1979. The Florida collateral attack rule, Fla.R.Crim.P. 3.850 (1983), allowed petitioner to challenge his conviction and death sentence "at any time." *Most likely, he waited until the eleventh hour to challenge his conviction in the state courts, and then in the district court, because he thought this would give him the best chance to obtain a stay of his execution. Moreover, the more complicated a petitioner's claims are, especially if they need an evidentiary hearing to be resolved, the greater the chance is that a stay will be forthcoming, at least until his claims are determined.*

**22.** *Cf.* Hill & Baker, *Dam Federal Jurisdiction!,* 32 Emory L.J. 3, 80 (1983):

We submit that no federal jurist would seriously maintain that the federal courts are quite adequate to the enforcement of constitutional guarantees and that state courts are not needed. Therefore, it is important that whatever cleavage may have developed be bridged as soon as possible. This will require that the state courts assume full responsibility in these areas and that the federal courts recognize the important role of the States....

**23.** *See Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

court to dismiss, without consideration on the merits, a habeas corpus petition from a state prisoner when that petition contains claims that have not been exhausted in the state courts. . . . " [24]

This simple, clear, and unyielding rule, when combined with habeas rule 9,[25] means that in the great majority of cases a petitioner must swiftly bring all his claims to the district court in one petition, and all the claims must be exhausted. *Galtieri,* 582 F.2d at 356–358. These claims, presented first in state court, are likely to be well focused and developed, and the district court can swiftly and accurately adjudicate all constitutional issues. As the *Rose* Court said, "[r]ather than increasing the burden on federal courts, strict enforcement of the exhaustion requirement will encourage habeas petitioners to exhaust all of their claims in state court and to present the federal court with a single habeas petition." [26] A rigorously enforced exhaustion requirement, when combined with habeas rule 9, will reduce piecemeal litigation, and "both the courts and the prisoners should

benefit, for as a result the district court will be more likely to review all of the prisoner's claims in a single proceeding, thus providing for a more focused and thorough review." [27] As the en banc court said in *Galtieri,* "[c]onsiderations of comity,[28] avoidance of piecemeal litigation, economy of judicial energy, and the fullest consideration of a petitioner's claims are best served if all of a petitioner's claims are presented to the state court system at one time." 582 F.2d at 356.

### C. *Waiver of Exhaustion*

Two recent decisions of this court have placed the eleventh circuit among the minority of federal judicial circuits that permit the district court or the court of appeals to entertain on the merits a mixed petition whenever the State's counsel (usually the attorney general) explicitly waives the petitioner's failure to exhaust all of his claims. *Thompson v. Wainwright,* 714 F.2d 1495 (11th Cir.1983); *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983).[29] With due re-

---

**24.** 455 U.S. at 532, 102 S.Ct. at 1210. (Brennan, J., joined by Marshall, J., concurring in part and dissenting in part).

**25.** Rule 9, Delayed or Successive Petitions, Rules Governing § 2254 Cases. 28 U.S.C. foll § 2254 (1976).

**26.** 455 U.S. at 520, 102 S.Ct. at 1204.

**27.** *Id.*

**28.** One of the economies of the total exhaustion rule is that the district court should be spared the often difficult task of determining, for example, whether, under the *Thompson-Westbrook* rule, *see infra* text at 1539–1543, it should entertain a mixed petition, or whether there has been an abuse of the writ or undue delay within the meaning of Rule 9, 28 U.S.C. foll. § 2254 (1976). This latter determination may require an evidentiary hearing. *See, e.g., Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1973).

**29.** *See also Lamb v. Jernigan,* 683 F.2d 1332, 1325 n. 1 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). The fourth circuit also permits explicit waiver. *Sweezy v. Garrison,* 694 F.2d 331, 333 (4th Cir.1982) (per curiam), *cert. denied,* —— U.S. ——, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983). The fifth circuit seems to have not yet made up

its mind, although the *Thompson* panel indicated otherwise, 714 F.2d at 1502. *Compare Felder v. Estelle,* 693 F.2d 549, 554 (5th Cir. 1982) (citing *Galtieri* permitting explicit waiver) *with Scott v. Maggio,* 695 F.2d 916, 919 n. 4 (5th Cir.), *cert. denied* —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983) (not clear after *Rose* whether waiver permissible). Courts of Appeal for the first, second, third, sixth, and tenth circuits have refused to permit waiver. *E.g. Bowen v. Tennessee,* 698 F.2d 241, 243 (6th Cir.1983) (en banc); *Navanjo v. Ricketts,* 696 F.2d 83, 87 (10th Cir.1982) (per curiam); *Slotnick v. O'Lone,* 683 F.2d 60, 61 (3d Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); *Sostre v. Festa,* 513 F.2d 1313, 1314 n. 1 (2d Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975); *Needel v. Scafati,* 412 F.2d 761, 766 (1st Cir.), *cert. denied* 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 113 (1969). The Seventh Circuit has all but adopted a no-waiver rule, *Mattes v. Gagnon,* 700 F.2d 1096, 1098 n. 1 (7th Cir.1983) (federal habeas court must consider exhaustion even if not raised by parties). *See also Ventura v. Cupp,* 690 F.2d 740, 741 (9th Cir.1982) (per curiam) (district court must dismiss unexhausted petition unless petitioner shows no other remedies or good cause); *Batten v. Scurr,* 649 F.2d 564, 567–68 (8th Cir.1981) (court will not raise exhaustion when state conceded exhaustion, considerable time invested in case, and exhaustion not challenged in appeals court).

**1540**

spect to the panels in those cases, their holdings were plainly foreclosed by *Rose v. Lundy.* Today's case presents this court with an opportunity to set aside those holdings and bring this circuit into compliance with the law.

*Thompson* held that a district court could, in its discretion, accept or reject the State's waiver of exhaustion. *Thompson* relied in part on *Westbrook;* it also cited a number of our cases, including prior fifth circuit opinions, in which we considered mixed petitions on the strength of the State's explicit or implicit waiver of exhaustion. 714 F.2d at 1501. The *Thompson* court, in particular, proceeded on the assumption that *Rose* had not decided the waiver question and reasoned that because comity, the basis for exhaustion, was founded on the relation between federal courts and the states (not merely state courts), comity would not be injured by permitting the attorney general to waive exhaustion on behalf of the State. The court perceived no injury because the Florida Attorney General, as " 'the chief state legal officer' of the executive department," had the authority to speak for the state and for its court system, as well.

To me, the *Thompson* rationale is contrary to the clear import of *Rose, Galtieri,* and the statute. Moreover, it will lead district courts to disregard the policies behind the exhaustion rule, and it will create mischief of its own accord.

First, I see no room in *Rose,* or *Galtieri,* for *Thompson.* Nowhere in any of the *Rose* opinions, even the dissent, is there even a hint that waiver is permissible. The *Rose* majority described its rule as a "rigorously enforced total exhaustion rule." 455 U.S. at 518, 102 S.Ct. at 1203. *Thompson,* however, holds that a district judge may enforce the rule only when he sees fit, 714

F.2d at 1509; thus, the rule will become neither rigorously enforced nor total. Justice O'Connor, for the *Rose* majority, and Justice Brennan, partially concurring, read the total exhaustion rule as requiring an immediate *sua sponte* dismissal of a mixed petition [30] and *none* of the other opinion writers in *Rose* differed with that view of the rule. Under *Thompson,* though, a district court is not required to dismiss a mixed petition *sua sponte;* rather, it may await the attorney general's decision whether to insist on prior state court consideration of the unexhausted claims. If the attorney general decides to waive exhaustion, the district court must then address the question of whether it will keep the case or dismiss it.

The *Thompson* rule is also contrary to the statute, which limits the availability of relief to exhausted petitions and orders that no petition may be "deemed" exhausted unless there are no state remedies or other processes available to protect the petitioner's rights. 28 U.S.C. § 2254(b) & (c) (1976). As the third circuit held in *United States ex rel. Trantino v. Hatrack,* 563 F.2d 86, 96 (3d Cir.1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1499, 55 L.Ed.2d 524 (1978), "neither concession nor waiver relieves the federal court of its responsibility to decide only those habeas claims Congress has authorized it to hear under § 2254(b).... 'Waiver,' like 'concession,' is not a talisman, the incantation of which will cause the exhaustion requirement to disappear. That requirement remains." [31]

The waiver of exhaustion idea endorsed by *Thompson* is flatly refuted by *Bergman v. Burton,* 456 U.S. 953, 102 S.Ct. 2026, 2027, 72 L.Ed.2d 478 (1982), a post-*Rose* decision. In that case the district court dismissed

Of the foregoing cases, all are post-*Rose* with the exception of *Sostre, Needel,* and *Batten.*

**30.** *See supra* note 24 and accompanying text. The seriousness with which the Supreme Court views the exhaustion requirement is also evident from *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), *rev'g* 664 F.2d 610 (6th Cir.1982), where the Court granted certiorari and reversed on exhaustion alone.

*See* 459 U.S. at 8, 103 S.Ct. at 280 (Stevens, J., joined by Brennan and Marshall, JJ., dissenting). *See also Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981) (seventh circuit, when presented with obvious constitutional claim, should have dismissed because claim unexhausted).

**31.** This strong admonition, of course, is even more cogent after *Rose.*

without prejudice an unexhausted claim from a two-claim mixed petition. The State did not contest, either in the district court or the court of appeals, the district court's authority to adjudicate the merits of the exhausted claim. *See Burton v. Bergman,* 649 F.2d 428, 429 (6th Cir.1981). Nonetheless, the Supreme Court, *sua sponte,* vacated the court of appeals' judgment on the merits and remanded for dismissal in light of *Rose. See* discussion *infra* text at 1544. The *Thompson* and *Westbrook* panels did not consider this case.[32]

It is clear that *Rose* bars *all* mixed petitions. Even if *Rose* left the question open, there are manifold policy reasons why we should enforce this rule. First, *Rose* defined the exhaustion doctrine as one designed to aid state *courts,* not states generally. This much the *Thompson* panel conceded. 714 F.2d at 1507 n. 11. A state attorney general's decision to waive the exhaustion requirement may not always be compatible with the interests of his own courts; this is no doubt why *Rose* provides no accommodation for an attorney general's waiver. In a capital case, for example, where a death warrant has been issued and the petitioner's execution is scheduled to take place in a matter of days, perhaps even hours, the attorney general, in the hope of avoiding a postponement of the execution, may "waive" the petitioner's failure to exhaust all of his claims so that the petitioner's case may be concluded and he can be executed.[33] This is what happened in this

case; the attorney general "waived" the formal exhaustion of at least nine claims.

While such a tactic may suit the attorney general's and the State executive department's needs of the moment, it is likely to have a pronounced adverse effect on the needs of the *state courts. See Galtieri,* 582 F.2d at 358. By countenancing such a tactic, the district court may be interpreted as harboring a lack of respect toward the state judicial system and the view that state judges are not as capable of rendering correct constitutional decisions as are federal judges. As Professor Bator has noted, "nothing is more subversive of a [state] judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by [the federal court]." Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441, 451 (1963). The district court also removes the state court as the primary locus for factfinding in post-conviction relief.[34]

A second policy reason for requiring total exhaustion is that it will allow state courts to become more familiar and hospitable to constitutional claims of prisoners. In this circuit, for example, we have recently articulated new standards for judging sixth and fourteenth amendment ineffective assistance of counsel claims.[35] Were we now to commence entertaining such claims without

---

**32.** *Thompson* and *Westbrook* also did not address the similar cases discussed *infra* text at 1544.

**33.** In noncapital cases the attorney general may have just the opposite incentive. If it is in his interest to delay as long as possible the petitioner's release from custody on a federal habeas writ, the attorney general will likely urge the district court to dismiss the petition for want of exhaustion.

**34.** Judge Hill and Professor Baker have observed this fact in arguing the need for more federal deference to state court decision making:

[T]he protection of the constitutional rights of the citizens is not, ought not be, and can-

not be the exclusive business of the federal courts. There simply are not enough federal judges and federal courts to see to the protection of all the people and all their rights. That is reason enough for the fact that state jurists are obligated to apply federal law and federal constitutional guarantees in their work. Indeed, how else can one expect the state judiciary to identify with and protect federal rights than by having a hand in their evolution?

Hill & Baker, *supra* note 22, at 79.

**35.** *See Washington v. Strickland,* 693 F.2d 1243 (5th Cir. Unit B 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983).

exhaustion, we would deprive the state courts of the opportunity of becoming familiar with them and, moreover, of disposing of them on state substantive or procedural grounds.

Third, waiver damages the concept of finality in the state court system, with concurrent injury to the rehabilitation and general deterrence purposes of sentencing.[36] *See supra* text at 1537. The Supreme Court has admonished the federal habeas courts not to "detract from the perception of the trial of a criminal case in state court as a decisive and portentous event." *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), cited in *Galtieri*, 582 F.2d at 359.

Fourth, permitting the district courts to litigate mixed petitions may impair the quality of constitutional decision making. A petitioner's mere inclusion of unexhausted claims, especially a proffer of evidence in support thereof, might influence the district court's resolution of the exhausted claims. *Accord, id.* Such a scenario cannot occur if the district courts dismiss mixed petitions *sua sponte*, as mandated by *Rose*.

A fifth reason for requiring total exhaustion is to avoid the type of selective waiver by attorneys general permitted by *Thompson* and *Westbrook*. If the petition is assigned to a district judge with whom the attorney general is comfortable, a waiver will be likely;[37] if not, the attorney general may decide to move for dismissal for lack of exhaustion. Such subtle "judge shopping" would be unseemly at best. Any rule that would countenance it, however tacitly, deserves exacting scrutiny.

I foresee other shortcomings with the *Thompson-Westbrook* approach. One is

that the entertainment of mixed petitions will, in time, promote substantial side issues, under habeas rule 9, concerning delayed and successive petitions. Assume that the petitioner brought a total of five claims, with only three exhausted. If previously the attorney general had consistently waived exhaustion but declined to do so in this case, the petitioner, if he desired to go forward with his exhausted claims, would have to amend his petition to dismiss the two unexhausted claims. Later, when he returned to the district court after exhausting the two claims, petitioner might well have a valid defense to the State's assertion under habeas rule 9 that his claims were successive or unduly delayed. He would contend that his new petition should not be deemed successive because it was caused by a reasonable reliance on the attorney general's waiver policy. He would contend that he should not be barred by delay because "the state, having [earlier] had notice of the claims, cannot establish prejudicial delay." *Galtieri*, 582 F.2d at 358.

These rule 9 issues often involve difficult questions of fact, *see Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); the ones I have posed above could be quite time consuming. A policy that invites a petitioner to prosecute successive petitions, each asserting newly exhausted claims, not only impedes the orderly and complete consideration of his case in state court, it greatly impairs the efficiency of the federal habeas court to dispose of his claims. The *Thompson-Westbrook* rule also enables a district judge to hear both exhausted and unexhausted claims, even when the petitioner's unexhausted claims ought to be handled by the state court first.[38] A

---

**36.** In *Galtieri* we noted a similar difficulty caused by mixed petitions. When a prisoner is required to be brought before a federal tribunal only once there is less disruption in his custodial status. We noted that complete exhaustion lessened the possibility of intermittent interruptions of a petitioner's prison sentence, thus aiding the state's correctional system, especially its rehabilitative programs. 582 F.2d at 360.

**37.** Under *Thompson's* rationale, the district judge may have discretion not to accept the waiver, in which event he would, presumably, dismiss the mixed petition.

**38.** For example, the unexhausted claims may involve novel questions of state law, better handled in state court, which may be dispositive of the petitioner's case. Such a case was presented to the district court in *Washington v. Strickland*, 693 F.2d 1243, 1265 (5th Cir. Unit B 1982) (en banc) (Tjoflat, J., concurring), cert.

rigorously enforced total exhaustion rule would remove the judge's temptation to hear the case.

### D. *Noticing Exhaustion on Appeal*

*Galtieri* held that the policy considerations counselling total exhaustion at the district court level were outweighed when this court was presented on appeal with exhausted claims from a mixed petition. We therefore declined to endorse a rule requiring dismissal on appeal of claims from a mixed petition, 582 F.2d at 361, adopting instead a flexible approach that would allow us to pass on the merits of the petitioner's exhausted claims. This holding of *Galtieri* is no longer correct.

*Rose v. Lundy* commands "strict enforcement of the exhaustion requirement," 455 U.S. at 520, 102 S.Ct. at 1204, at *all* levels of habeas litigation and permits no flexibility. In his concurrence in the *Rose* judgment, Justice Blackmun noted that the appellate portion of *Galtieri* was inconsistent with the mandate of *Rose.* He stated, *id.* at 529 n. 7, 102 S.Ct. at 1209 n. 7;

> Even the Fifth and Ninth Circuits, which require dismissal of mixed habeas petitions in the typical case, do not follow the extreme position the Court takes today.... The Fifth Circuit will review the merits of exhausted claims contained in a mixed petition if the District Court has considered those claims.

*See Galtieri v. Wainwright,* 582 F.2d 348, 361–362 (5th Cir.1978) (en banc). Justice Blackmun's reading of *Rose* and *Galtieri* is correct. After *Rose* we may no longer review exhausted claims from a mixed petition.

The strong medicine *Rose* prescribes is quite understandable and, when one carefully considers the policies it seeks to vindicate, quite reasonable. This medicine was prescribed to bring an abrupt halt to the practice of the litigation of mixed petitions.

In *Galtieri,* we instructed the district courts not to hear them. At the same time, we said that if they did hear and decide them, we would entertain them on appeal. As it turned out, we thus provided an atmosphere for the ad hoc litigation of mixed petitions and the *sub rosa* disregard of the very policies that we, in *Galtieri,* and the Supreme Court, in *Rose,* sought to further.

To "strictly enforce" *Rose*'s total exhaustion requirement and properly supervise the processing of habeas petitions by district courts in this circuit, we are bound to notice the lack of exhaustion *sua sponte* on appeal and to order the dismissal of mixed petitions. Any lesser course of action will not provide the rigor demanded by *Rose,* and will result in the continuing disregard of exhaustion policies that *Galtieri* seems to have spawned. The Supreme Court in *Isaac,* 456 U.S. at 123 n. 25, 102 S.Ct. at 1569 n. 25, strongly intimated that an appellate court that encounters an unexhausted claim is bound by *Rose* to dismiss the entire habeas petition.[39] *Accord, Bowen v. Tennessee,* 698 F.2d 241 (6th Cir.1983) (en banc); *see also United States ex rel. Lockett v. Illinois Parole and Pardon Board,* 600 F.2d 116, 118 (7th Cir.1979) ("We conclude that there is no bar to our raising the issue of exhaustion on our own, although it has not been raised by the State either in the district court or in the briefs on appeal.") *See* discussion of *Bergman v. Burton, infra* text at 1544; *see also Mattes v. Gagnon,* 700 F.2d 1096, 1098 n. 1 (7th Cir. 1983) (exhaustion raised *sua sponte*).

In *Bowen v. Tennessee, supra,* the en banc sixth circuit was presented with a case similar to this one, involving an appeal of exhausted claims from a mixed petition in which lack of exhaustion was waived. The panel had entertained the claims on the merits. The en banc court, following *Rose*'s command, reversed:

> Wherefore, in light on [sic] the emphasis in *Rose* upon comity as protecting "the

---

granted —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983).

**39.** *Rose* applies to pending appeals, such as this one. *Bergman v. Burton,* 456 U.S. 953, 102

S.Ct. 2026, 72 L.Ed.2d 478 (1982); *Rodriquez v. Harris,* 455 U.S. 997, 102 S.Ct. 1627, 71 L.Ed.2d 858 (1982); *Duckworth v. Cowell,* 455 U.S. 996, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982).

state *courts'* role in the enforcement of federal law and prevent[ing] disruption of state *judicial* proceedings" [adding emphasis to *Rose* quote], this court concludes that the total exhaustion rule promulgated in *Rose* may not be waived or conceded in the district court by a state attorney general and may be noticed by this court *sua sponte* on appeal.

698 F.2d at 243.

The sixth circuit's holding was based on *Duckworth v. Cowell,* 455 U.S. 996, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982) and *Rodriquez v. Harris,* 455 U.S. 997, 102 S.Ct. 1627, 71 L.Ed.2d 858 (1982). In both of these cases the Supreme Court encountered exhausted claims from mixed petitions which the courts of appeals decided on the merits. The Court in each case granted certiorari, cited *Rose,* vacated the judgments, and remanded to the court of appeals "with directions that it instruct the [district court] to dismiss the petition for a writ of habeas corpus." 455 U.S. at 996, 102 S.Ct. at 1626; 455 U.S. at 997, 102 S.Ct. at 1627.

In *Bergman,* the Sixth Circuit Court of Appeals entertained on the merits an exhausted claim from a mixed petition; the district court dismissed the unexhausted claim without considering it on the merits. *Burton v. Bergman,* 649 F.2d 428, 429 (6th Cir.1981). The State did not, apparently, object to either court proceeding to the merits of the exhausted claim. The court of appeals directed that the writ issue on the exhausted claim. The State petitioned the Supreme Court for certiorari, presenting in its certiorari petition only the merits of the exhausted claim. The Supreme Court granted certiorari, vacated the judgment, and remanded "for further consideration" in light of *Rose.* As Justice Stevens, dissenting, stated,

> The petition makes no reference to the unexhausted claim. Ignoring the four questions presented by the [State], the Court grants [its] petition, vacates the judgment of the Court of Appeals, and remands for reconsideration in the light of *Rose v. Lundy.*

Under *Rose v. Lundy*—if I read the Court's opinion correctly—after the case gets back to the District Court, that Court must dismiss the habeas corpus petition that is now a part of the record.

102 S.Ct. at 2027–28 (Stevens, J., joined by Marshall and Blackmun, JJ., dissenting) (footnote omitted).

*Bergman* instructs us, plainly, that if we fail to notice a lack of exhaustion *sua sponte,* the Supreme Court may. By taking the step it did, the Court showed that a mixed petition with exhaustion implicitly waived requires remedial dismissal by any federal court which notices it. The en banc court should take such action today.

I realize that this seems to equate the exhaustion rule to a rule of subject matter jurisdiction. Exhaustion is not purely jurisdictional, because federal courts are granted subject matter jurisdiction to hear habeas corpus claims from state prisoners by 28 U.S.C. § 2241(c)(3) (1976). 28 U.S.C. §§ 2254(b) and (c) (1976), however, limit the relief a district court may grant to those "applications" that present only exhausted claims. *See supra* text at 1533. Sections 2254(b) and (c) also narrowly define which claims may be deemed exhausted. The Supreme Court has given this statute a literal interpretation, to give full effect to the policies Congress sought to enforce. Because no two litigants may stipulate to a district court's entertaining a habeas petition when the petition does not satisfy section 2254 and *Rose,* the exhaustion doctrine must be viewed as quasi-jurisdictional. Accordingly, we must notice the lack of exhaustion in this case and remand it to the district court with the instruction to dismiss the petition.

## IV.

Realizing that to do so may detract from my argument that *Rose* mandates the dismissal of this case, I address the merits of petitioner's *Witherspoon* claim. The record shows that petitioner's trial counsel did not properly preserve for state appellate court review the specific issue the court decides today: whether the state trial judge was

correct in concluding that venire members Varney and Murphy were sufficiently biased against the death penalty to be disqualified to serve as jurors. Because this issue was not preserved for appeal and thus, I submit, not decided on the merits by the Florida Supreme Court, petitioner must show cause and prejudice under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Petitioner did make a "*Witherspoon*" objection at trial, and that objection was preserved for appellate review. It was a patently unmeritorious objection, however, and as such was rejected out of hand by the Florida Supreme Court. The *Witherspoon* objection the court recognizes and rules upon today was not made, was therefore not preserved for appeal, and was not dealt with by the Florida Supreme Court. The petitioner has admitted as much; in presenting his *Witherspoon* claim to the district court he stated that it had not been exhausted.[40] This is why *Sykes* cause and prejudice must be shown. Since petitioner has not made this showing, I would deny the writ.

The following chain of events makes my thesis clear. Before voir dire of the venire members began, the lawyers for the parties met with the trial judge in chambers to consider a defense motion in limine.[41] The following colloquy took place:

THE COURT: All right. We are here to hear a motion. The State and the defendant represented by counsel, the de-

**40.** Petitioner's *Witherspoon* claim was made a part of his habeas petition on September 14, 1979. *See, e.g., supra* text at 1534. The claim first surfaced in petitioner's answers to the State's interrogatories that asked the petitioner to disclose any federal constitutional claims that he had in addition to the three claims he presented in his original and first amended habeas petitions. *Id.,* at 1534–1536. He stated that he had 23 additional claims, including the *Witherspoon* claim here in issue, and that none of these additional claims had been exhausted. App.Rec., vol. 1, ex. 20. Several of these 23 claims, including the *Witherspoon* claim, were, of course, technically exhausted, in that petitioner had failed seasonably to raise them either at trial or on appeal, and he was consequently barred from presenting them to the state courts for consideration on the merits. *See supra* note 13 and accompanying text. *Accord, Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982).

**41.** Fifty days before petitioner's case was called for trial he moved the court to foreclose both the prosecution and the defense (and presumably the court) from examining any prospective juror, during the voir dire of the venire, as to his or her views about capital punishment and to deny all challenges for cause based on such views. Petitioner's motion read as follows:

COMES NOW the Defendant, by and through his undersigned counsel, and moves this Court for an order limiting the voir dire examination of the prospective jurors, and alleges:

1. That under the Supreme Court's ruling in *Witherspoon v. Illinois,* 389 U.S. 1035, 88 S.Ct. 793, 19 L.Ed. [sic] 822, the Supreme Court ruled that in a non-bifurcated trial, the prosecutor could be allowed to ask whether or not a juror would ever consider imposing the death penalty.

2. That subsequent to the enactment of Florida Session Law 72–724, Florida Statute 921.141 provides for two (2) deliberations by a Florida jury—one to consider guilt or innocence, and a subsequent deliberation to consider mercy or no mercy.

3. That any questions asked by a prosecutor relating to whether or not a juror would even consider capital punishment in no way relates to, is not reasonably related to nor relevant to a decision on the defendant's guilt or innocence and an answer by a juror that the juror could not consider the death penalty would not in any way affect the ability of the juror to participate fully and freely in deliberations on the questions of innocence or guilt.

4. That *to allow the prosecutor to ask Witherspoon-type questions and be granted challenges for cause on the basis that the juror could not consider the death penalty unduly prejudices the defendant's right to a fair trial,* in violation of his right to a fair and impartial jury trial and to due process in violation of the Fifth and Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 16 and 22 of the Florida State Constitution.

WHEREFORE, *the defendant requests that this Honorable Court enter an order limiting both the prosecution and the defense from asking any questions of the prospective jurors relating to their belief either for or against the death penalty and to deny any and all challenges for cause based upon Witherspoon-type questions.*

Trial Record, vol. 1, at 106–107.

fendant is present in person. *We are to hear a motion by the defendant to limit the State Attorney of his voir dire examination, arguing the Willie Spoon [sic] case.*

All right, sir, I am not inclined to grant it. I will be glad to listen to you on it. MR. MALONEY [defense counsel]: Your Honor, I do not wish to argue very longly [sic]. *The Court held in the Willie Sppon [sic] case the prosecutor could not ask these type of questions.* In Florida we now have biforcated [sic] trial. The first part of the trial is used only to determine the question of facts, whether or not this individual committed a capital crime.

THE COURT: Yes, sir.

MR. MALONEY: I think that *a question regarding how the jury would be disposed to punishment* in the event they found a verdict of guilty *would be irrelevant and immaterial to* that trial and to their determination of the question of fact, *whether or not he did it* [i.e., commit murder]. And *all we are asking is that such questions first not be asked by either parties, and if, in fact, the Court is going to allow the questions to be asked, that a response in the negative they would not impose the death penalty not constitute a challenge for cause.*

THE COURT: No, sir, if, at the conclusion of the trial, the jury should return a verdict of guilty of murder in the first degree, which is a capital offense, the same jury would serve as the jury in the second half of the biforcated [sic] trial and there will not be a re-selection of a jury. At this time on voir dire it is necessary to ask questions of this jury including their attitude on such things and it's got to be now.

Under the Florida capital punishment law there are certain conditions set up under which the proper penalty is the death penalty. In a prospective jury—It is my ruling if a prospective juror states on his voir dire examination that because of his moral, religious or conscientious principles and belief he would be unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law, then he in effect has said he would be unwilling to follow the law the court shall charge upon it and disregard and be unwilling to follow it or if he did follow it, it would be going against his principles, and, therefore, I would rule that would be disqualification. If that exists, I intend to disqualify for cause.

*You made your motion and your objection and the motion will be denied. You will, of course, be allowed at the time of the voir dire examination to raise your namely [sic] objection, but would indicate the ruling at this time. I am not cutting you off from objecting when we get to that specific question. Generally, that will be my ruling. I won't cut them off from inquiring in the general area; the specific questions they ask may be objectionable, I don't know.*

MR. MALONEY: If I raise the objection, which I would, will the Court make it a continuing objection?

THE COURT: Yes, sir.

MR. McDANIEL [State's attorney]: *Is the Court saying it is going to be a continuing objection from here on out?*

THE COURT: *Continuing objection to that particular line of questions.*

MR. McDANIEL: *I take it your objection right now is continuing from here on out?*

THE COURT: *Yes, sir, to the whole general line of questions. Still I am not telling you I will deny your objection on some specific question for some other reason you feel it has gone too far.*

MR. MALONEY: Yes, sir.

Trial Record, vol. 3, at 16–19 (emphasis added). It is clear to me that petitioner's lawyer, at the outset, mistakenly thought [42]

---

**42.** His mistake was understandable, perhaps, given the fact that this was the first post-*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), capital case tried in Polk County, Florida, and counsel did not know until the morning the trial was to begin that he would be the defense attorney (petitioner had

that *Witherspoon,* applied in the context of Florida's recently enacted bifurcated trial procedure in capital cases, foreclosed any mention of the death penalty during the jury selection process.[43]

Petitioner's motion in limine asserted two alternative grounds: first, that *Witherspoon* prohibited, as "irrelevant and immaterial," *any* venire voir dire on the issue of punishment prior to the jury's determination of guilt; second, that the court could not excuse for cause any venire member who could not vote for the death penalty. The motion was timely but unmeritorious on both grounds. As to the first ground, the motion was timely because it informed the trial judge before voir dire began that any inquiry of a venire member, in advance of the guilt phase of the trial, concerning his or her feelings about the death penalty would be "irrelevant and immaterial" and would constitute federal constitutional error. The motion was unmeritorious because such voir dire inquiry was not only proper, but required.

As to the second ground, the motion was timely because it informed the trial judge that it would be improper and would constitute federal constitutional error for him to excuse for cause any venire member who indicated that he or she "would not impose the death penalty." In other words, regardless of the extent of the venire member's bias against the death penalty, an excusal for cause would be error. Had the judge agreed with petitioner's view of the law, he would have granted petitioner's motion *instanter,* since a contemporaneous objection at the time of the venire member's challenge for cause would have added nothing to petitioner's motion in limine and thus would have been unnecessary. The judge did not agree, however, and properly so,

because petitioner's view of the *Witherspoon* rule was in error. *Witherspoon* does not entitle a capital defendant to jurors who "would not vote to impose the death penalty." *Witherspoon* only insulates from a challenge for cause a prospective juror who could vote for the death penalty under some circumstances.[44]

A *Witherspoon* objection must be made contemporaneously, after the prospective juror has been examined about his views on the death penalty. The objection is addressed to the juror's state of mind. In ruling on the objection, the trial judge must of course consider the questions put to the prospective juror and his responses. The judge is not restricted to these naked statements, however. The judge may also consider any evidence that bears on the venire member's bias: his demeanor, tone of voice, nonverbal communications, and comprehension of the questions asked of him and other venire members. Unless a defendant's objection is properly stated *and* contemporaneous, the judge may be deprived of the opportunity to make further inquiry of the venire member and to state on the record what, if anything beyond the naked words that have been spoken, he may have considered in determining that the venire member is disqualified to serve on the jury.

After denying petitioner's motion in limine, the trial judge, recognizing the contemporaneous nature of a *Witherspoon* objection, invited counsel to make timely and specific *Witherspoon* objections during voir dire to any questions put to any individual venire member concerning his or her feelings about the death penalty. The judge also invited counsel to object to the excusal for cause of anyone demonstrating a bias against the death penalty sufficient to dis-

two lawyers) who would conduct the jury voir dire.

**43.** Precisely when, if at all, counsel thought the jurors were to be qualified for service during the sentencing stage of the trial does not appear in the record.

**44.** *Witherspoon* authorizes the excusal for cause of:

(1) a venire member who makes unmistakably clear that he would automatically vote against the imposition of capital punishment without regard to the evidence presented or (2) a venire member whose attitude toward the death penalty would prevent him from making an impartial determination as to the defendant's guilt.

*See Adams v. Texas,* 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

qualify him or her for jury service. As the record of the ensuing voir dire indicates, counsel never made such objections. Instead, counsel merely requested the court to treat his unmeritorious pretrial motion in limine as a "continuing objection." The court granted his request.

After the court and counsel returned to the courtroom to begin the venire voir dire, petitioner's counsel, in a final effort to insulate the venire from any examination about the death penalty, renewed the motion in limine he had just argued in chambers. He said:

Your Honor, pursuant to the motion I filed beforehand I object to this question[ing]. I believe that it is irrelevant to the matter at hand and I think that the discussion of this at this time prejudices the defendant's right to a fair and impartial trial.

Trial Record, vol. 3, at 43–44. The court denied counsel's motion, and the venire voir dire commenced.

Throughout the voir dire the trial judge's attention was obviously focused on petitioner's motion in limine as petitioner had stated it in his formal pretrial pleading, *supra* note 41, and in chambers. As the colloquy on voir dire shows, petitioner's counsel said nothing to indicate that he intended his "continuing objection" to mean anything more than what he had presented to the court prior to trial.[45] His "continuing objection" did not grow into its present form until his final amendment to his habeas petition in the district court.

The second venire member to be examined, and the first to be excused for *Witherspoon* cause, was Mr. Varney. Venire member Varney was excused for cause after the court's *Witherspoon* inquiry. *Id.,* at 45. When the court announced that it would excuse Varney for cause, petitioner's counsel stated "I renew the objection. I do not

think he should be challenged for cause." By this the lawyer meant that he renewed his motion in limine. The court replied, correctly, "Yes, sir, the objection will be noted and overruled." Moments later the court excused venire member Mays for cause, stating "Mr. Maloney, I assume you wish the same objection to apply to him." Maloney replied, "Yes, your honor," *id.,* at 46, again referring to his motion in limine. The third excusal for cause under *Witherspoon* took place following the examination of venire member Carn. After a long colloquy with her, the court excused her. *Id.,* at 107. Counsel objected, stating "Your honor, once again I object, *I don't think that is relevant*" (emphasis added), an obvious reference to the first ground of his motion in limine. The court stated, "Objection will be noted." Counsel's objection, here, shows that he continued to challenge the relevancy of the line of questioning rather than the sufficiency of the bias shown by excused venire members. The court next excused for cause venire member Maher. *Id.,* at 110. After her negative answer to the proper *Witherspoon* questions, the court said, "Very well, over the objections of the defendant she will be excused." Counsel said nothing, apparently satisfied that his continuing objection was being honored.

The last venire member excused for cause under *Witherspoon* was Murphy. After Murphy was excused, *id.* at 165, counsel said nothing, and the clerk called the next venire member. The court then spoke to the court reporter, "Mrs. Horne, you will note the defendant object [sic] to him [Murphy] being excused for cause." This was nothing more than the court's acknowledgement that it had considered petitioner's motion in limine as having been renewed and denied. At no time did the defense counsel object to Murphy's excusal on the ground that Murphy had not made it unmistakably clear

---

45. We have considered in a related context the inadequacy of a motion in limine to serve the purposes of a contemporaneous objection. "[M]otions in limine are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial. . . . [A contemporaneous objection] will give the trial court an opportunity to reconsider the grounds of his motion in light of the actual—instead of hypothetical—circumstances at trial." *Collins v. Wayne Corp.,* 621 F.2d 777, 784 (5th Cir.1980). *See* Annot., 63 A.L.R.3d 311, 333 (1975) (citing cases).

that he would automatically vote against the death penalty (the issue brought to the district court, and decided by us today) or that his feelings against the death penalty would impair his ability to find guilt.

By failing to state a proper contemporaneous objection, counsel denied the trial judge the opportunity to question Murphy further or to state the reasons why he concluded that Murphy was disqualified. Those reasons might have gone beyond Murphy's naked responses to the questions put to him. As I have indicated, *supra* text at 1547, the judge may have relied on Murphy's demeanor, nonverbal communications, tone of voice, his comprehension of the *Witherspoon* inquiry directed to him and other venire members, and any other evidence that may have indicated the extent of Murphy's bias.

Florida law is settled that if a capital defendant wishes to object to the exclusion of a venire member for cause he must make a timely and proper objection. *Brown v. State,* 381 So.2d 690, 693–94 (Fla.), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1980); *Paramore v. State,* 229 So.2d 855 (Fla.1969), *vacated on other grounds,* 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972). Failure to make a timely and proper objection waives the issue. *Id.; see also* 33 Fla.Jur.2d, Juries § 109 (1982); Fla.Stat.Ann. § 913.03 (1983). Because petitioner failed to object to Murphy's excusal for cause on the ground that Murphy did not unequivocally indicate that he would automatically vote against the death penalty, petitioner waived that issue.

Consequently, the Florida courts would not, and apparently did not,[46] consider the issue decided here: whether Murphy was excluded for showing the type of bias justifying a *Witherspoon* excusal for cause.

In summary, petitioner has brought us an objection he did not raise in state court. Failure to follow Florida's clear, and unambiguous, contemporaneous objection rule constituted a "procedural default" under *Wainwright v. Sykes, supra.* Accordingly, petitioner must show cause for failing to object, and actual prejudice resulting from the forfeiture.[47] *See Douglas v. Wainwright,* 714 F.2d 1532, 1547 (11th Cir.1983).

"Cause and prejudice" is a conjunctive standard, both prongs of which must be satisfied by the petitioner before a court is free to ignore the procedural default and hear the merits of the petitioner's claim. *Isaac,* 456 U.S. at 134 n. 43, 102 S.Ct. at 1575 n. 43. A petitioner may not raise a procedurally defaulted claim without meeting the standard. *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (28 U.S.C. § 2255); *Douglas,* 714 F.2d at 1547. This petitioner has not shown cause and prejudice; *Wainwright v. Sykes* requires us to deny the writ. *Sykes,* 433 U.S. at 85, 97 S.Ct. at 2505; *Sullivan v. Wainwright,* 695 F.2d 1306 (11th Cir.1983) (procedural default on *Witherspoon;* burden to show cause and prejudice on petitioner); *see also Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (prisoner forced to wear prison garb at trial must preserve objec-

---

**46.** Petitioner's motion in limine, based on a faulty interpretation of *Witherspoon,* is in the trial record. *See supra* note 41 and accompanying text. It, and the trial court's ruling thereon, was before the Florida Supreme Court on direct appeal. That court, in describing the claims presented to it, stated that petitioner sought reversal because of "the exclusion of prospective jurors because of their expressed attitudes toward the death penalty." 329 So.2d at 288. That is all the court had to say on the matter. Had petitioner raised the precise *Witherspoon* claims he presents here as to venire members Murphy and Varney's bias, the Florida Supreme Court would have been bound by its contemporaneous objection rule to reject

those claims on procedural grounds. *See supra* note 41 and accompanying text.

**47.** It is a settled rule that where a state court in a post-conviction proceeding rules on the merits of a procedurally defaulted claim, the federal court may proceed to the merits of the claim without inquiring as to the existence of cause and prejudice. *Douglas,* 714 F.2d at 1547 n. 19; *Thomas v. Blackburn,* 623 F.2d 383, 386 (5th Cir.1980), *cert. denied,* 450 U.S. 953, 101 S.Ct. 1413, 67 L.Ed.2d 380 (1981). No state court ruled on the merits of the *Witherspoon* claims petitioner presents here. *See supra* notes 41 & 46. Accordingly, he must overcome the cause and prejudice hurdles.

tion). *See generally* C. Wright, Federal Courts 339–43 (4th ed. 1983).

The *Sykes* opinion identified important interests advanced by requiring compliance with a state's contemporaneous objection rule as a precondition to obtaining federal habeas relief. Such a requirement "enables the record to be made with respect to the constitutional claim when the recollections of witnesses are freshest" and "enables the judge [such as the one in petitioner's case] who observed the demeanor of those witnesses to make the factual determination necessary for properly deciding the federal constitutional question." 433 U.S. at 88, 97 S.Ct. at 2507. *See* discussion *supra* text at 1547, 1548. Failure to enforce the contemporaneous objection rule, the Court stated, "may encourage 'sandbagging' on the part of defense lawyers, who may take their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off." *Id.* at 89, 97 S.Ct. at 2508. Further, insisting on a contemporaneous objection is desirable because it "encourages the result that [state trial] proceedings be as free of

error as possible." *Id.* at 90, 97 S.Ct. at 2508. The policy considerations expressed in *Sykes* apply fully to petitioner's case.

We should consider the *Sykes* issue even though the state did not raise it in the district court or on appeal. *Isaac* is the latest full Supreme Court exposition on state procedural default and federal habeas relief. That case presented to the Supreme Court three consolidated habeas proceedings in which the petitioners had failed to object to improper jury instructions. The constitutional issue concerning their claims was fairly novel. Even though the State never raised the procedural default issue against one of the petitioners, the Supreme Court stated that both the district court and the court of appeals had properly considered the issue. *Id.* 456 U.S. at 124 n. 26, 102 S.Ct. at 1570 n. 26. The *Isaac* Court distinguished two prior cases, neither of which bar our consideration of the issue *sua sponte*.[48] Moreover, policy considerations stated by *Sykes* favor our raising the issue. Petitioner sandbagged his claims and dumped them in the district court. Had he made a proper *Witherspoon* objection at trial, the putative error could have been

---

48. The Court distinguished *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Although *Smith* and *Jenkins* have been cited for the proposition that a court should not entertain a procedural default *sua sponte, see Thompson,* 714 F.2d at 1503, neither case fully considered the issue. In *Smith* the Court simply said:

> For the reasons stated by the Court of Appeals, we reject the State's argument that respondent waived his Fifth Amendment claim by failing to make a timely, specific objection to Dr. Grigson's testimony at trial. See 602 F.2d, at 708, n. 19. In addition, we note that the State did not present the waiver argument in its petition for certiorari. See this Court's Rule 40(1)(d)(2) (1970).

451 U.S. at 468 n. 12, 101 S.Ct. at 1876 n. 12. The *Jenkins* Court limited its discussion to raising the procedural default *sua sponte* in the Supreme Court:

> The petitioner did not raise his constitutional claims during his state-court trial. Thus, the respondent argues that the rule of *Wainwright v. Sykes,* 433 U.S. 72, 53 L.Ed.2d 594, 97 S.Ct. 2497 (1977), bars consideration of the petitioner's habeas petition. But the respondent failed to raise the Sykes question in

either the District Court or the Court of Appeals. Ordinarily, we will not consider a claim that was not presented to the courts below. See *Dorszynski v. United States,* 418 U.S. 424, 431, n. 7, 41 L.Ed.2d 855, 94 S.Ct. 3042 [3047, n. 7] (1974). Considerations of judicial efficiency demand that a Sykes claim be presented before a case reaches this Court. The applicability of the Sykes "cause"-and-"prejudice" test may turn on an interpretation of state law. See *Rummel v. Estelle,* 445 U.S. 263, 267, n. 7, 63 L.Ed.2d 382, 100 S.Ct. 1133 [1135, n. 7] (1980). This Court's resolution of such a state-law question would be aided significantly by the views of other federal courts that may possess greater familiarity with Michigan law. Furthermore, application of the "cause"-and-"prejudice" standard may turn on factual findings that should be made by a district court. Accordingly, we do not consider the Sykes issue in this case.

447 U.S. at 234 n. 1, 100 S.Ct. at 2127 n. 1. Application of the cause and prejudice standard in the instant case requires no fact-finding. Accordingly, *Smith* and *Jenkins* do not militate against our proceeding *sua sponte,* and *Isaac* encourages us to do so.

resolved, or at least clarified. Petitioner is not entitled to the writ.

JAMES C. HILL, Circuit Judge, concurring specially:

I concur in the result announced for the court by Judge Johnson.

I concur only because, on this record, Mr. Murphy was disqualified from serving as a juror but it had not been clearly shown that he would *automatically* vote against the imposition of capital punishment regardless of the evidence. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1967). I agree with all that Judge Fay says touching upon the peculiar position occupied by a trial judge, enabling him or her best to evaluate the venireperson's responses to *Witherspoon* questions. I do not find it remarkably different from what is said by Judge Johnson. Perhaps I should be inclined to show more deference to the finding of the trial judge than either. A conscientious trial judge must be bent upon determining if a prospective juror has such a mind set that he or she would refuse to vote for the death penalty regardless of the evidence in the case. That is fact-finding. "The state of a man's mind is as much a fact as the state of his digestion." *Eddington v. Fitzmaurice,* 29 Ch. 459, 483 (1885) (Bowen, L.J.).

Yet the record must contain sufficient evidence to justify a finding of fact that a venireperson was of such a mind set that he or she was, under the law, disqualified, or the finding cannot be said to be supported. In Mr. Murphy's case, there was not sufficient evidence. He was clearly shown to be a person who could not vote in favor of capital punishment without violating his principles. He was not asked (so he never said) whether or not, if the evidence were sufficiently strong and the circumstances sufficiently aggravating, he could nevertheless vote to recommend the death penalty.

Judge Fay recounts for us the painstaking and conscientious efforts of Judge De-

well to adhere to the teachings of *Witherspoon* in the voir dire proceedings.[1] It seems clear that Mr. Murphy heard and, no doubt, understood what had been asked of those who had been examined before him. One must assume that he fully expected to be asked, after he had acknowledged his principled opposition to the death penalty, whether or not he could nevertheless vote in favor of it if the evidence in the case indicated it to be appropriate under the law. For aught appearing, he may have felt compelled under his oath to say that he could. Until it appeared that he could not, he was not disqualified. Applying the teachings of *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), the writ must issue, conditioned upon resentencing.

I find nothing in this record to indicate that the jury which convicted and recommended sentence for Darden was one "uncommonly willing to condemn a man to die." Judge Fay gives us a glimpse of Darden's crimes. We do not fix sentence; we merely pass upon contentions that the proceedings leading to the sentence were constitutionally flawed. *Witherspoon* and *Davis* require me to conclude that the disqualification of Mr. Murphy was such a flaw.

For this reason, I concur in the judgment.

FAY, Circuit Judge, concurring in part and dissenting in part, with whom RONEY and HENDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge, join.

Over ten years ago, on September 8, 1973, Willie Darden shot Carl Turman between the eyes and killed him while robbing his wife, Helen Turman. Interrupted by a sixteen year old boy who tried to aid Carl Turman, Darden tried to kill him by shooting him in the mouth, neck and side. In addition, Darden attempted to force Helen Turman to commit an unnatural sex act upon him at gun point. Convicted and sentenced to death, Darden has exhausted his

---

1. Fully acknowledging the flaw Judge Johnson has detected, *see supra* note 4 and accompanying text (at 1531), it seems clear to me that

Judge Dewell understood and made diligent effort to apply *Witherspoon* in these proceedings.

legal remedies in both the state and federal courts. By a divided and confused court, the majority now holds that the trial jury selected in January, 1974 was not asked the proper questions under *Witherspoon*.[1] I concur in that portion of the majority opinion discussing the law controlling the *Witherspoon* issue but dissent from that portion dealing with the application of this legal standard.

As stated in the panel opinion:

*Witherspoon* has been interpreted and applied in a plethora of cases. It is well settled that a state has the power to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.
*Adams v. Texas,* 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), *quoting Witherspoon v. Illinois,* 391 U.S. at 522–23, n. 21, 88 S.Ct. at 1777 (emphasis in original).

Neither *Witherspoon* nor *Adams* provides trial courts with a formula or requisite colloquy for the proper excusal of prospective jurors on *Witherspoon* grounds. Instead, the trial judge must decide whether each particular venireperson has made it 'unmistakably clear' that he or she is within one of the two prongs of *Witherspoon.* The trial judge is in the best position to evaluate the prospective juror's demeanor and answers to the questions. For this reason, trial judges are generally accorded broad discretion in evaluating juror impartiality. *See, Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Rob-*

*bins,* 500 F.2d 650, 653 (5th Cir.1974). This tenet has even greater efficacy in a situation such as the present one—a federal appellate court reviewing the decision of a federal district court on a § 2254 habeas corpus petition alleging constitutional error in a state trial.

699 F.2d at 1037–8.

As pointed out by the majority, application of the *Witherspoon* rule involves a mixed question of law and fact. Mixed questions of law and fact involve the application of legal principles to the historical facts. The development of the facts is in the trial court. It is the trial judge who conducts and participates in the voir dire examination. It is the trial judge who must evaluate, analyze and interpret the responses of the venirepersons. "In assessing the adequacy of a venireperson's response to *Witherspoon* questions, a reviewing court *must* grant some deference to the trial court's assessment of the juror's demeanor and clarity of his answer." *McCorquodale v. Balkcom,* 721 F.2d 1493 at 1498 (11th Cir.1983). (emphasis added) "*Witherspoon* requires a reviewing court to independently review the record to ensure that the exclusions were proper, but that review must take into account that the trial judge was in a much better position to evaluate the clarity of a juror's response." *Id.* at 1498, *citing O'Bryan v. Estelle,* 714 F.2d at 395 (5th Cir.1983) (Higginbotham, J. concurring). The discussion by Judge Higginbotham in *O'Bryan,* cited above, is an excellent analysis of the many factors involved in the standard of review for appellate courts dealing with this issue. I adopt it in full and set forth here some pertinent extractions.

The selection of a jury in a capital case includes many judgment calls by trial judges—calls that involve the judge's intuition about the demeanor of the venireman, the appropriateness of his response,

---

1. The habeas petition in this matter was filed on May 21, 1979. The district court denied relief on May 8, 1981. Notice of appeal was filed on June 9, 1981. Our panel opinion was issued on February 14, 1983. The *en banc* court considered the case and found itself evenly divided. An appropriate order was entered on July 1, 1983. On petition for rehearing, the *en banc* court reconsidered the case and now issues this opinion.

his manner, dress, and his inflection. It is a decision with the usual stuff of trial court decisionmaking, calls more dependent upon intuition, shrewdness, or courtroom savvy than abstract analogical processes. Correspondingly, one need not pause for long to summon up myriad examples of expression whose meaning can only be determined by the inflection and manner of its expression. For example, the simple expressions 'I reckon so' and 'I could hardly do so' may or may not express doubt.

In sum, ruling upon a request to exclude a venireman inevitably involves an interpretation of what was asked and answered. The dynamic trial scene is not easily conformed to a mold judicially shaped to facilitate review or to achieve a targeted level of accuracy, perhaps because few but lawyers and judges talk and think in such a fashion, peculiarly so with the interrogation of veniremen in death cases. Indeed, there is almost a pattern in the clarity and certainty of response—progressing from hesitation and vagueness at the outset toward greater comprehension and clarity at the end. And this mental groping ought not be a surprise. Few citizens chosen at random have so thought through the profound moral and ethical questions implicated by a *Witherspoon* qualification as to do otherwise.

A trial court's decision to sustain a challenge for cause because the venireman would automatically vote against the death penalty sometimes presents questions of fact in the sense that the trial court must choose from permissible inferences. That choice is often aided by the opportunity to observe and sometimes cannot be made without that opportunity.

*Id.* at 393.

Appellate review of mixed questions of law and fact and questions of ultimate fact was discussed by the Supreme Court in *Swint.* The Court intimated that the two categories may involve essentially the same type of determination, of whether the legally determinative consideration is 'satisfied by subsidiary facts

admitted or found by the trier of fact.' 102 S.Ct. at 1788–89 n. 16. Cases similar to *Witherspoon,* involving exclusions of veniremen for bias resulting from pre-trial publicity, traditionally have been characterized as involving a mixed question of law and fact. *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878). For that reason in these cases there is on appeal an independent evaluation of the voir dire testimony. *Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1642; *United States v. Williams,* 523 F.2d 1203, 1208 (5th Cir.1975); *Wansley v. Slayton,* 487 F.2d 90, 98 (4th Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974). Yet, citing *Irvin v. Dowd,* we held in *United States v. Robbins,* 500 F.2d 650 (5th Cir.1974), that 'rulings on suggestions of impartiality of the jury is within the discretion of the trial judge, and an abuse of that discretion must be clear.' *Id.* at 653. *See also Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1950). This combination of independent review and deference to the trial judge was evident in *United States v. Taylor,* 554 F.2d 200 (5th Cir.1977). We noted there that the trial judge had discretion to decide whether to excuse a juror but nonetheless reversed his decision not to do so. Though we did not expressly characterize our review as 'independent', we reexamined the colloquy between the judge and juror, noted that '[i]t was apparent to the judge that [the juror] was extremely reluctant to sit on this jury,' and concluded that '[t]he right to an impartial jury trial, free of fear, dominated all other considerations.' These cases establish that reviewing courts can engage in an independent review and simultaneously give weight to trial court decisions.

*Id.* at 394.

In summation, Judge Higginbotham concludes:

An extreme standard of proof coupled with a standard of decision calling for an

extreme level of stated partiality requires reviewing courts to freshly make the *Witherspoon* decision. At the same time, both the standard of proof and nature of the venire decision itself counsel against a total ban of deference to such trial court decisions. All considered, I am persuaded that independent appellate review by a standard of abuse of discretion responds to the concerns of *Witherspoon* while expressing the values of comity and of respect for trial court integrity with its sometime superior opportunity for accurate decisionmaking. Independent review is an understandable expression of appellate courts' reluctance to tie their hands in advance when the stakes are so high. Here an abuse of discretion standard will allow reviewing courts freedom to correct asserted *Witherspoon* error without dilution of its demanding standard while giving weight to the trial court's decision as warranted by the circumstances of the particular case.

*Id.* at 396.

My disagreement with the majority holding is in the application of our yardstick to the record of this case. The majority opinion has extracted the question put to Mr. Murphy after he was called into the jury box but ignores all that went on in the courtroom before that moment. Most respectfully, I suggest this is not the correct approach. Trial juries are selected in a variety of ways but none are a mystery. This particular jury was selected in a very routine fashion. All of the prospective jurors were seated in the courtroom. Preliminary remarks and instructions were given. A series of questions was propounded to the group and then to individuals seated in the jury box. All in the courtroom participated and were in a position to hear the proceedings. As usual, the questioning was more detailed and more personal when directed to those first placed in the box. Of necessity many of the questions were repeated many times, particularly the questions going to the *Witherspoon* issue. As the proceedings progressed the judge and counsel would refer to questions asked earlier rather than to repeat each again and again.

The following extracts illustrate what transpired before Judge John H. Dewell on January 15, 1974, in the County courthouse, Inverness, Florida.

The trial judge explained to the jury their role in a bifurcated capital trial:

THE COURT: Now the first count, first degree murder, charges what is under the present law a capital offense. You may be aware that some time ago the capital punishment law of Florida was declared invalid by the Courts, by the U.S. Supreme Court. Since then the legislature has passed a new capital punishment law in Florida that is, and that law is in effect here today. Now under the new law in the event of a capital crime, such as we have here today, we have what is known as a bifurcated trial. That is a trial will be conducted in two parts.

In the first part the jury will hear the evidence in the case and will determine the guilt or the innocence of the defendant without regard to punishment at all, just determine the guilt or innocence of the charge. In the event the jury should return a verdict of not guilty or guilty of some lesser included offense less than a capital crime, of course, then that is the end of the trial. In the event that the jury should come back with a verdict of guilty of first degree murder, which is the capital offense then would be held by the same jury the second part of the bifurcated trial.

During the second part of the trial the jury would then be allowed to hear additional testimony concerning facts that were not admissible in consideration of the guilt or innocence. Matters of age or other factors listed in the Statute are mitigating or aggravating factors which could be considered. The jury would then, by a majority vote—now a vote of guilt or innocence must be a unanimous verdict, everyone must agree—but on your second verdict which is known as an advisory sentence the jury by a majority vote would recommend to me as a Court what the proper sentence should be. If they find that the aggravating circum-

stances are sufficient and they are not outweighed by mitigating circumstances then the proper recommendation would be that the death penalty be imposed. If they find that the mitigating circumstances outweigh any aggravating circumstances, then the recommendation, the verdict should be the advisory sentence should be for life imprisonment.

In either event the final decision is not the jury's. The final decision is rested solely with the Court. It will be my decision in the event of a verdict of guilty of first degree murder it will be my decision to whether or not, my determination alone, as to whether or not this defendant should go to the electric chair. I do want you to understand though that the law intends and I certainly would give great weight to what the advisory sentence would be. So you should not take your duties lightly. However, I would not be obligated to follow it. The jury might return a recommendation, advisory sentence of the death penalty and I might reduce it to life imprisonment and the jury might recommend life imprisonment and I would feel that they were wrong and sufficiently strongly to go ahead and administer the death penalty anyway. Both have been done in this state under the law, the new law.

Now that is a procedural situation, that is where we stand. I will tell you further in the event of life imprisonment on a capital crime the law provides that the defendant shall serve not less than twenty-five calendar years before he becomes eligible for parole which is contrary to the usual life sentence in any other life sentence the ordinary parole laws would apply.

Now do y'all understand the procedure in a bifurcated trial?

State Transcript Ex. Vol. III at 25–28.

At this time I want to get off into a different area concerning the capital punishment feature of the case. I have explained to you already the basic procedure. How we have a two section trial and how although the final determination in the event of a verdict of guilty of first degree murder the final determination as to penalty will be mine. But that you, if you are selected on the jury, would be called upon to listen to further testimony and to advise me by advisory sentence.

Now at the time of the submission of the case, should that time ever arrive, you will be instructed by me on the law as to what matters you should consider and what you should not consider and how you should go about in arriving at your advisory sentence. Under certain circumstances if you find the aggravating circumstances are sufficient they are not outweighed by mitigating [sic] then it would be proper under the law your correct verdict would be to recommend the death penalty.

Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death sentence even though the facts presented to you should be such as under the law would require that recommendation? Do you understand my question?

MR. MALONEY: Your Honor, pursuant to the motion I filed beforehand I object to this question. I believe that it is irrelevant to the matter at hand and I think that the discussion of this at this time prejudices the defendant's right to a fair and impartial trial.

THE COURT: All right, sir. Motion will be denied and the objection overruled.

All right, Mrs. Macy do you hold such conscientious moral or religious principles in opposition to the death penalty you would be unwilling under any circumstances to recommend the death sentence?

MRS. MACY: No, sir.

THE COURT: Do you, Mr. Blankenship?

MR. BLANKENSHIP: No, sir.

THE COURT: Mr. Pellellat?

MR. PELLELLAT: No, sir.

THE COURT: Mrs. Spike.

MRS. SPIKE: No, sir.

MR. VARNEY: Yes, sir.

THE COURT: You feel then, sir, that even though and I am not saying it will it would be purely speculative, in the event that the evidence should be such that under the law that should be the legal recommendation because of your conscientious beliefs?

MR. VARNEY: I believe I would.

THE COURT: All right, sir. You will be excused.

MR. MALONEY: I renew the objection. I do not think he should be challenged for cause.

THE COURT: Yes, sir, the objection will be noted and overruled.

All right, Mr. Varney, you will be excused. Thank you very much for your service.

CLERK: Number 114.

THE COURT: Mrs. Hann, do you hold such strong beliefs that you would be unwilling under any event to return a death sentence?

MRS. HANN: No, sir.

THE COURT: Mr. Waller?

MR. WALLER: No, sir.

THE COURT: Mr. DeMilt?

MR. DeMILT: No, sir.

THE COURT: Mr. Dorminy?

MR. DORMINY: No, sir.

THE COURT: Mrs. Keck?

MRS. KECK: No, sir.

THE COURT: Mr. Roberts?

MR. ROBERTS: No, sir.

THE COURT: Mr. Mays?

MR. MAYS: Yes. I could not recommend it.

THE COURT: All right.

You will be excused, Mr. Mays. Mr. Maloney, I assume you wish the same objection to apply to him.

MR. MALONEY: Yes, Your Honor.

THE COURT: So recorded.

(Mr. Mays was excused from the jury box).

*Id.* at 42–46.

The two prospective jurors that were added to replace those excused were then examined.

THE COURT: Do either of you hold such strong moral or religious conscientious principles in opposition to the imposition of the death penalty that you would be unwilling to recommend the imposition of the death penalty regardless of the evidence?

MR. PURCELL: No.

MRS. O'BRY: No.

*Id.* at 49.

Mr. McDaniel, assistant state attorney, conducted his examination of the prospective jurors.

Mrs. Keck, did you hear the indictment read, the charges against the defendant?

MRS. KECK: Yes, sir.

MR. McDANIEL: Merely hearing the indictment understanding he is charged with a capital offense and then robbery and then I believe assault with intent to commit first degre murder are these such horrible crimes that you would rather not sit? Are sitting there—I might be if I were in your position—saying 'Please don't make me stay. Let me go'? Are you in that position?

MRS. KECK: I don't believe so.

MR. McDANIEL: Mr. Roberts?

MR. ROBERTS: Yes, sir.

MR. McDANIEL: You feel the same way, you don't mind serving on this type of jury?

MR. ROBERTS: No, sir.

MR. McDANIEL: Mr. Purcell, other than your job?

MR. PURCELL: No, I don't mind.

MR. McDANIEL: Mrs. O'Bry?

MRS. O'BRY: No.

MR. McDANIEL: Mrs. Spike?

MRS. SPIKE: No.

MR. McDANIEL: I know I am pronouncing your name wrong.

MR. PELLELLAT: Pellellat.

MR. McDANIEL: You understand what the man is charged with?

MR. PELLELLAT: Yes.

MR. McDANIEL: And you have no objection to sitting on this type of jury?

MR. PELLELLAT: No.

MR. McDANIEL: And Mr. Blankenship?

MR. BLANKENSHIP: No, sir.

MR. McDANIEL: Mrs. Macy?

MRS. MACY: No.

MR. McDANIEL: Mr. Waller?

MR. WALLER: No.

MR. McDANIEL: Mr. DeMilt?

MR. DeMILT: No.

MR. McDANIEL: Mr. Dorminy?

MR. DORMINY: No, sir.

*Id.* at 52–54.

After Mrs. O'Bry, Mr. Waller, and Mr. DeMilt were peremptorily excused three additional prospective jurors were questioned.

THE COURT: Do either of the three of you hold such strong religious, moral or conscientious principles in opposition to the imposition of the death penalty that you would be unwilling to vote to recommend the death penalty regardless of what the evidence was?

MR. CARHUFF: No, sir.

MR. SCHNEIDER: No, sir.

MRS. LUCKER: No, sir.

THE COURT: Do any of you know of any reason good, bad or indifferent whatsoever whether it is a reason or just an excuse why you feel it might be difficult for you to sit here and be fair and impartial in a trial of this case?

MR. CARHUFF: No, sir.

MR. SCHNEIDER: No, sir.

MRS. LUCKER: No, sir.

THE COURT: You feel that you can and you would return a verdict based upon the evidence and the law which would be fair to both the State and to the defendant?

MR. CARHUFF: Yes, sir.

MR. SCHNEIDER: Yes, sir.

MRS. LUCKER: Yes, sir.

*Id.* at 88–89.

Mr. White, another assistant state attorney also examined the prospective jurors.

The Judge will instruct you that when you retire to the jury room to consider your verdict you have basically two things that you can look to; the law that this Court gives you and the evidence that comes from that chair right there. Now in everybody's mind in this courtroom today, and I am sure in yours, is the fact that this is a capital crime. Nevertheless would you hold true to your oath as jurors and consider two things in that jury room: the law that this Court gives you and the evidence that comes from that chair and nothing else? Would each of you do that?

Would each of you realize that just because this is a very serious crime, a capital case, the State has no higher burden of proof than it has on any other criminal case?

*Id.* at 92.

Mr. Roberts, Mrs. Spike, Mr. Purcell and Mrs. Keck were peremptorily excused. After a recess for lunch, the questioning continued for jurors who replaced those excused.

THE COURT: Ms. Carn, the fact your husband for a while was a police officer and the fact that we have here listed as witnesses many police officers and deputy sheriffs conceivably could raise a little bit of a problem. Do you think that because of your husband's previous occupation that you might be a little inclined to give what the officers say more weight than you would any other witness you didn't know?

MS. CARN: I don't think that I would; but I do not believe in capital punishment.

THE COURT: The question isn't ma'm, whether you believe in capital punishment or not; the question is whether or not you have such a strong disbelief in it as to make it unable for you to vote to return a recommendation of the death

**1558**

penalty regardless of what the evidence might be.

MS. CARN: That's right.

THE COURT: All right, ma'am. Then we will excuse you right now. I appreciate your candor.

MR. MALONEY: Your Honor, once again I object. I don't think that is relevant

THE COURT: Objection will be noted.

(Ms. Carn was excused from the jury box.)

*Id.* at 106–07.

BY THE COURT: I have asked the others and I will ask each of the four of you whether you have such strong religious, conscientious or moral principles against the imposition of the death penalty that you would be unwilling to vote to return a recommended sentence of the death penalty regardless of what the evidence or the facts might be?

Would you Ms. Pigeon?

MS. PIGEON: Yes, sir.

THE COURT: Mr. Wall?

MR. WALL: No, sir.

THE COURT: How about you, Ms. Maher?

MS. MAHER: Yes, I do have such convictions. I am a Seventh Day Adventist.

THE COURT: And no matter what the evidence showed you don't think you would vote for it?

MS. MAHER: I couldn't, sir.

THE COURT: Very well, over the objections of the defendant she will be excused.

(Ms. Maher was excused from the jury box.)

THE COURT: How about you, Mr. Parker?

MR. PARKER: No.

CLERK: Henry M. Embach. Number 34.

(Mr. Embach, was seated in the jury box.)

*Id.* at 109–10.

THE COURT: All right. Mr. Embach, do you have such strong religious or moral or conscientious principles in opposition

to the death penalty that no matter what the evidence is you would not be willing to vote to return a verdict?

MR. EMBACH: No, sir.

THE COURT: Recommending it.

MR. EMBACH: No, sir.

THE COURT: Fine, sir.

Now are any of the four of you new prospective jurors, are you conscious of any reason whatsoever why you could not sit as fair and impartial jurors in this case?

Do you know of anything at all in your background?

All right, Mr. State Attorney, you may inquire.

MR. McDANIEL: Thank you, sir.

How many of the jurors work for Florida Power?

I guess some of the ones that are gone must have worked for Florida Power.

Mr. Wall and Mr. Embach, Mr. Parker and Ms. Pigeon, did all of you hear the questions that were asked this morning by both myself, by Mr. Goodwill, by Mr. Maloney, Mr. White and by Mr. Kovach?

Would any of your answers be substantially different than those answers given by the members now present on the jury?

Any of the questions that I asked or anyone else asked raises any question in your mind.

You heard the explanation of presumption of innocence by Mr. Goodwill and Mr. Maloney, and, of course, the Court. Each of you heard that explanation.

Can you assure me at this time you can look at the defendant and say to yourself that he is innocent, "I will presume him innocent and require me and Mr. White to prove to you by the evidence from this stand that he is guilty beyond a reasonable doubt?

*Id.* at 112–13.

Mr. Blankenship was peremptorily removed and was replaced by Daniel Lord.

THE COURT: Are you conscious of any reason why you could not sit in this case as a fair and impartial juror?

MR. LORD: No, sir.

THE COURT: Do you have such strong religious or moral or conscientious principles in opposition to the death penalty that you would be unwilling to recommend, no matter what the facts were, you would be unwilling to recommend the death penalty to the Court?

MR. LORD: No.

THE COURT: All right, Mr. McDaniel, it is your turn.

MR. McDANIEL: Thank you, Your Honor.

Mr. Lord, I think I have approximately one question.

At any time today has there been any question asked by me to any of the jurors, prospective jurors that you think that your answers would have been different that what I wanted, what was responded to by the other jurors?

MR. LORD: No.

MR. McDANIEL: OK.

*Id.* at 131–32.

Mrs. Pigeon was peremptorily excused and was replaced by Jack Dwayne Hudson.

THE COURT: Do you have such strong principles in opposition to the death penalty under no factual situation would you be willing to vote to recommend to the Court the imposition of the death penalty?

MR. HUDSON: No.

THE COURT: You heard me this morning explain to all of the jurors the principle of presumption of innocence as applies to this defendant and the requirement his guilt be proved beyond a reasonable doubt before you could convict?

Do you feel that you will be able to accord him these rights?

MR. HUDSON: Yes, sir.

THE COURT: Will you do that, sir?

MR. HUDSON: Yes, sir.

THE COURT: Do you know of any reason why you could not sit in this case as a fair and impartial juror and return a verdict favorable both to the State and to the defendant?

MR. HUDSON: No, sir.

THE COURT: All right, Mr. White.

*Id.* at 140–41.

Mr. Lord was excused and replaced by Mrs. Helen Mays.

THE COURT: Mrs. Mays, you heard all of the questions today and I imagine you know all of the questions and answers by heard [sic] by now, but I will try you out on your memory.

Are you acquainted with the defendant over here?

MRS. MAYS: No, sir.

THE COURT: Willie Jasper Darden. Have you heard of him or this case before?

MRS. MAYS: No, sir.

THE COURT: Do you know any lawyers involved or any witnesses?

MRS. MAYS: No, sir.

THE COURT: Do you have any religious, moral or conscientious principles against the death penalty that are so strong that you would be unwilling to vote to recommend the death penalty regardless of what the facts might be?

MRS. MAYS: No, sir.

*Id.* at 150–51.

THE COURT: Mrs. Mays, do you know anything about this case at all?

MRS. MAYS: No, sir, I don't.

THE COURT: I have been through that. Have I asked you if you have any conscientious beliefs against the death penalty?

MRS. MAYS: No.

THE COURT: Do you know of any reason why you couldn't sit as a fair and impartial juror in this case today?

MRS. MAYS: No.

*Id.* at 157.

Mrs. Mays was peremptorily excused and was replaced by Ronald T. Staha.

THE COURT: Do you have any opinions or principles in opposition to the death penalty that are so strong that it would make it impossible or very difficult for you to vote to recommend a verdict of a death sentence regardless of what the facts might be?

MR. STAHA: No, sir.

*Id.* at 160.

Mr. Staha was excused and was replaced by Theodore T. Murphy.

THE COURT: Mr. Murphy, what is your occupation?

MR. MURPHY: Retired.

THE COURT: What did you do prior to retirement, sir?

MR. MURPHY: Several jobs. I was eight and half years in the administration office in a seminary, before that I was thirty years with the utilities.

THE COURT: What seminary were you with, sir?

MR. MURPHY: St. Pios, Uniondale, New York.

THE COURT: Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?

MR. MURPHY: Yes, I have.

THE COURT: All right, sir, you will be excused then.

(Mr. Murphy left the jury box.)

CLERK: Cecelia Clark Mulroy. Number 85.

THE COURT: Mrs. Horne you will note the defendant object [sic] to him being excused for cause.

(Mrs. Mulroy was seated in the jury box.)

THE COURT: Mrs. Mulroy, would your answers to the questions that I have been asking the other jurors would be the same as theirs?

MRS. MULROY: Yes, sir.

THE COURT: You know nothing about the case; you don't know the defendant or none of the lawyers.

MRS. MULROY: No.

THE COURT: None of the witnesses.

MRS. MULROY: No, I don't.

THE COURT: If the facts justify it would you have no such principles in opposition to the death penalty that you would be unwilling to vote to recommend the death penalty?

MRS. MULROY: Depending on the evidence.

THE COURT: Yes, ma'am.

*Id.* at 165–66.

A jury of twelve was accepted and sworn and alternate jurors were questioned.

In my opinion the excusal of Mr. Murphy is supported by this record. The trial judge concluded that Mr. Murphy could not follow the law and would not vote for any verdict that might result in the death sentence regardless of the evidence presented or the facts found. Mr. Murphy had worked "thirty years with the utilities." After this career it appears he worked in the administrative office of the St. Pios Seminary, Uniondale, New York. It would not be unreasonable to draw certain conclusions from these facts above. Mr. Murphy's response to the *Witherspoon* question is unequivocal. Only the trial judge could evaluate its forcefulness or the manner in which it was made. Mr. Murphy had heard the same, or similar, question many times that day. He probably knew it was coming and had thought about it long before being seated in the jury box. To suggest that the trial court's ruling was based upon one question and one answer is to ignore reality (and the record of the state court proceedings).

Applying any standard [2] to the ruling in question leads me to the conclusion that Mr. Murphy was properly excused for cause. Most respectfully, I dissent.

**2.** If "abuse of discretion" is applied as the standard, there is none; if "a close study of the voir dire transcript to determine whether a venireperson was improperly excluded from the jury" is the standard, the majority has in my opinion failed to study this record closely enough; and if "an independent appellate review" means that the court of appeals is going to determine the state of mind of the venireperson involved, we are simply wrong.